```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF NEW YORK
 2

 3    ---------------------------------------X
                                             :
 4    In Re:                                 :   Case No. 05-60006
                                             :
 5         REFCO, INC.,                      :
                                             :
 6               Debtor.                     :
                                             :
 7    ---------------------------------------X
      AXIS REINSURANCE COMPANY,              :   07-0712-RDD
 8                                           :
                 Plaintiff,                  :
 9                                           :
                 v.                          :   One Bowling Green
10                                           :   New York, New York
      BENNETT, et al.,                       :
11                                           :   October 12, 2007
                 Defendants.                 :
12    ---------------------------------------X

13
            TRANSCRIPT OF HEARING ON SUMMARY JUDGMENT MOTION
14             BEFORE THE HONORABLE ROBERT D. DRAIN
                  UNITED STATES BANKRUPTCY JUDGE
15

16    APPEARANCES:

17    For Tone Grant:          NORMAN L. EISEN, ESQ.
                               Zuckerman Spaeder LLP
18                             1800 M Street NW
                               Washington, D.C.  20036-5802
19
      For Axis Reinsurance:    JOAN M. GILBRIDE, ESQ.
20                             Kaufman, Borgeest & Ryan LLP
                               200 Summit Lake Drive
21                             Valhalla, New York  10595

22    For Joseph Murphy:       JOHN J. JEROME, ESQ.
                               Saul Ewing LLP
23                             1500 Market Street, 38th Floor
                               Philadelphia, Pennsylvania 19102-2186
24

25

                               (Appearances continue on next page.)
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3   APPEARANCES CONTINUED:

 4   For Dennis Klejna,        HELEN B. KIM, ESQ.
       Gerald Sherer,          Baker & Hostetler LLP
 5     William Sexton,         12100 Wilshire Boulevard, 15th Floor
       and Philip Silverman:   Los Angeles, California  90025-7120
 6
                               IVAN O. KLINE, ESQ.
 7                             Friedman & Wittenstein
                               600 Lexington Avenue
 8                             New York, New York  10022

 9   For Robert Trosten:       BARBARA MOSES, ESQ.
                               Orrick, Herrington & Sutcliffe, LLP
10                             666 Fifth Avenue
                               New York, New York  10103
11

12   For Director Defendants:  MICHAEL WALSH, ESQ.
                               Weil, Gotshal & Manges
13                             767 Fifth Avenue
                               New York, New York  10153
14

15

16   Court Transcriber:        RUTH ANN HAGER
                               TypeWrite Word Processing Service
17                             356 Eltingville Boulevard
                               Staten Island, New York 10312
18

19

20

21

22

23

24

25



          Proceedings recorded by electronic sound recording,
          transcript produced by transcription service
```

3

1  (Proceedings began at 10:11 a.m.)

2        THE COURT:  Okay.  We're here on the Refco / Axis

3  Reinsurance Company summary judgment motion.

4        MS. KIM:  Good morning, Your Honor.  Helen Kim with

5  Baker and Hostetler.  I represent defendant -- counterclaim

6  plaintiff, Dennis Klejna, and I'm presenting the oral argument

7  on behalf of Mr. Klejna, as well as counterclaim plaintiffs

8  William Sexton, Gerald Sherer, and Philip Silverman.

9        Your Honor, we seek summary judgment on the grounds

10 that the express terms of the Axis policy requires Axis to pay

11 defense costs as incurred.  There's no dispute between the

12 parties that where the terms of a policy provides for

13 advancement of defense costs insurer must advance until there's

14 been an adjudication of no coverage.  And for that purpose,

15 Your Honor, we have cited the WorldCom and Kozlowski [Ph.]

16 cases, as well as numerous other cases around the country.

17       So we start in this case with the language of the

18 U.S. Specialty policy, the primary policy as to which the Axis

19 policy follows form.  The insuring agreement (a) of the U.S.

20 Specialty policy requires that the insurer pay losses, which

21 includes defense costs as incurred for a claim for wrongful

22 acts, and condition (b)(2) of the primary policy provides that

23 the insurer will pay the covered defense costs on an incurred

24 basis if it is finally determined that any defense costs paid

25 by the insurer are not covered under the policy.

4

1          The insureds agree to repay such noncovered defense

2    costs to the insurer.  So the Axis policy, which follows the

3    form of the U.S. policy, has a two-step process, payment as

4    incurred of defense costs, and repayment of those defense -- of

5    noncovered defense costs if there's a final determination of no

6    coverage.

7          So the crux of the issue before this court is the

8    legal interpretation of Axis's obligation to pay defense costs.

9    Now, Axis takes the position that its obligation to advance

10   defense costs are triggered only when coverage is undisputed.

11   According to Axis, and I quote from its brief, "The Axis policy

12   expressly allows Axis to make the initial determination of

13   whether or not something is covered."

14         Now, we've searched the Axis policy and the

15   underlying primary policy high and low and we can't find any

16   provision in the Axis policy that gives Axis that right and

17   Axis cites none.  I note it seems that U.S. Specialty and

18   Lexington, the first Axis carriers, also couldn't find any

19   provision either because it's undisputed that based on the very

20   same language of that primary policy both U.S. Specialty and

21   Lexington advanced defense costs until the polices were

22   exhausted.

23         We note that condition (d)(2) would be rendered

24   illusory if Axis could avoid its obligation to advance simply

25   by disclaiming coverage.  So when we look at the term "payment

5

1   of covered defense costs," we believe that the term "covered"

2   refers to a Claim -- that's capital C claim and that's a

3   defined term -- for a wrongful act, in this case a securities

4   claim.

5          And to determine whether an action is covered we must

6   look to the face of the pleading, the complaint, to see if

7   there are any facts or grounds alleged that would bring the

8   action within the liability coverage purchased.  That's

9   precisely the approach that was taken by the Appellate Division

10  first department in Kozlowski and other cases as well.  So,

11  Your Honor, we submit that if this were a car accident, this

12  would not be a claim for a wrongful act.  We would acknowledge

13  that based on the pleadings on the face of the complaint that

14  such a claim would not be covered for payment of defense costs.

15         Now, in this case, Axis concedes that the underlying

16  actions constitute a claim which falls within the insuring

17  agreement.  You note that they make that express concession on

18  page 12 of their brief, but it takes the position that it's

19  entitled to apply the knowledge exclusion and that this court

20  must defer to Axis's initial determination that the knowledge

21  exclusion has been triggered.  For that purpose, Axis asserts

22  that the knowledge exclusion has been triggered by

23  Mr. Bennett's alleged knowledge.

24         We submit, Your Honor, that as a matter of law Axis

25  can only invoke a policy exclusion to avoid coverage if it can

6

1  show that the allegations of the complaint cast the pleadings

2  solely and entirely within the policy exclusions.  Both the

3  Tyco case and the Carlin Equities case, which Axis brought to

4  the Court's attention by letter on Wednesday make that point

5  very clear and I want to thank Axis for bringing the Carlin

6  Equities case to the Court's attention and, in fact, if I had

7  found the case myself I would have relied upon it.

8          Both Koslowski and Tyco on all three cases,

9  Koslowski, Tyco, and Carlin Equities make clear that unless

10 it's clear from the face of the pleadings in the underlying

11 action that the claims fall entirely within the scope of an

12 exclusion, the insurer's obligation to advance defense costs

13 remains.  Here Axis cannot meet that burden and it has not.

14         Axis can't establish from the face of the pleadings

15 in our underlying actions that the claims fall within the

16 knowledge exclusion.  In fact, as the Court is aware the issue

17 of Bennett's knowledge, what he knew, and when he knew it is

18 hotly disputed.  It's at the heart of the underlying securities

19 actions, as well as the criminal action against Mr. Bennett and

20 others.  That issue will have to be resolved in those

21 underlying actions and can't be resolved on the face of the

22 pleadings.

23         So we're left with a situation where an exclusion is

24 disputed and, in fact, the counterclaim plaintiffs have

25 asserted that exclusion doesn't even exist at all because it

7

1  was improperly added by Axis after the commencement of the

2  policy period and in terms of the police binder.  We're not

3  aware of any case, and Axis cites none, where advancement was

4  denied based on an exclusion that was disputed or that required

5  proof of a disputed fact.

6            In fact, therefore, Your Honor, Axis has the

7  obligation and retains the obligation to pay defense costs

8  subject to their right of recruitment of those payments if

9  there's a final determination of no coverage.

10           That's the only argument I have, Your Honor, on the

11  primary argument for summary judgment.

12           I do want to briefly address their -- Axis's request

13  for priority -- on priority of payments, if I may.  Your Honor,

14  in their opposition papers, Axis asks the Court to include a

15  finding of priority of payments.  They made that similar

16  request with respect to the indicted officers' motion for

17  preliminary injunctive relief.  Your Honor, we believe that

18  that request is improper.  There's no pleading or motion before

19  the Court requesting allocation or determination of priority as

20  between the parties and that any order in this case in the

21  event the Court grants summary judgment should remain neutral

22  on the issue of priority payment so that payments can be made

23  in accordance with the terms of the policy.

24           Unless Your Honor has any questions.

25           THE COURT:  I may have questions of you after I hear

8

1    from the other parties, but right now, I don't.

2            MS. KIM:   Thank you, Your Honor.

3            MR. WALSH:   Good morning, Your Honor.  Michael Walsh,

4    Weil, Gotshal and Manges on behalf of the director defendants.

5            THE COURT:   Good morning.

6            MR. WALSH:   I concur in Ms. Kim's presentation.   I

7    just wanted to expand a little bit on the contract

8    interpretation so not going to go through everything that she

9    referred to.

10           It seems like, you know, when I look at all the

11   pleadings back and forth when it comes down to those three

12   little words "cover defense costs" and Axis is trying to read

13   so much into that one word "covered," that undefined term

14   basically that they can as a binding matter determine not to

15   pay until everything is resolved in terms of coverage, the

16   insuring agreements and exclusion.  We think that that is an

17   unreasonable interpretation.  We think that it's putting too

18   high a burden on one little undefined word.

19           Our interpretation is, as Ms. Kim said, which defense

20   costs that on their face fall within the terms of the insurance

21   agreement -- insuring agreement, require advance unless and

22   until a court finally determines that coverage does not exist.

23   Ms. Kim, you know, tracked through the various definitions to

24   say that it falled within the insuring agreement.

25           So what we think is a better way to look at this is

9

1    almost a two-part test:  Can the Court make a determination
2    today that the claims fall within the Side A coverage?  The
3    insuring agreements which refer to claim loss, defense costs,
4    and wrongful act, the answer is yes, the claim was covered;
5    step two would be can the Court make a determination today that
6    an exclusion applies.  If the answer is yes, then the claim no
7    longer falls within the policy coverage we're done; if the
8    answer is no, then the claim remains covered for step one until
9    such time as there is such a determination.

10            We think that's the only way to sort of reconcile all
11   the language here, and we think that that's certainly
12   consistent with the, you know, New York policy to give
13   directors what sophisticated businesspeople would have expected
14   in the D&O policy.  We think it's certainly consistent with the
15   WorldCom case, which although it turned on the issue of
16   precision came out the same way requiring the advancement of
17   defense costs pending a final determination on the rescission
18   in question.

19            Axis tries to distinguish that case in two ways.
20   First, they argue that the language in the WorldCom policy is
21   materially different than what we have here in the U.S.
22   Specialty policy, what we call the primary policy, but I think
23   that is much too strained an interpretation.  If you look at
24   the language -- the advancement language in WorldCom, which
25   starts off with the phrase "Under Coverage A and Coverage B the

10

1  insurer shall advance," I think the only reasonable

2  interpretation of that is that it's referring to covered

3  defense costs, that it is referring to defense costs that come

4  within the insuring provision of Coverage A and Coverage B.

5         As I mentioned earlier, Axis also tries to

6  distinguish WorldCom because it's a rescission case but, you

7  know, we have to look at the ultimate result, Your Honor, and

8  if whether it's rescission or the application of exclusion or

9  any other theory which denies coverage.  It's the same thing

10  for the director defendants, so we don't think that's an

11  appropriate way to distinguish that court.

12        So in summary, since we have -- we don't believe we

13  have any facts that are in dispute here.  We have the

14  underlying litigation which falls within the definition of

15  wrongful acts, et cetera, so the only thing that is left for

16  the Court is this interpretation.  And our position, Your

17  Honor, is that the only reasonable interpretation is the one

18  that we're giving to the policy.  The only interpretation which

19  would, in essence, give effect to the obligation to advance is

20  our interpretation and we request the Court enter a judgment

21  for us on the basis of a summary judgment.

22        THE COURT:  What is on record showing that your

23  clients dispute the exclusion, the fraud exclusion?

24        MR. WALSH:  I think that we submitted statement of

25  facts where we said that the underlying coverage comes within

11

1   the terms of the definition of the policy.  I'm not sure we

2   need to go any further than that.

3          THE COURT:  Okay.

4          MR. EISEN:  Good morning, Your Honor.  Norman Eisen,

5   counsel for Tone Grant and arguing on behalf of Mr. Grant,

6   Mr. Bennett, and Mr. Trosten.

7          Your Honor, we have addressed the issues before the

8   Court once, twice actually on preliminary injunction and twice

9   again today, and we would rely on the arguments advanced by the

10  previous counsel by Ms. Kim and Mr. Walsh and will not belabor

11  the identical arguments for the Court.  If the Court has

12  questions for us at this time or later, of course, we're

13  pleased to entertain them or if the Court would like to hear

14  from us, we're prepared to do that, but we do stand on the

15  identical arguments.  They are the same -- it is the same

16  policy and the same arguments.

17         THE COURT:  Okay.  Again, I may have questions for

18  you after I hear from Ms. Gilbride, but right now I don't.

19         MR. EISEN:  Thank you, Your Honor.

20         MR. JEROME:  Excuse me, Your Honor.  I note that

21  nobody has raised an argument for Mr. Murphy.  Ms. Kim left him

22  out of the description of those to whom she was speaking.  For

23  the record I would just like to say I adopt all of the

24  arguments, [inaudible].

25         THE COURT:  Okay.  All right.  Thank you.

12

1          MS. GILBRIDE:   Good morning, Your Honor.   Joan

2    Gilbride for Axis Insurance Company.

3          THE COURT:   Good morning.

4          MS. GILBRIDE:   Your Honor, we have submitted to Your

5    Honor in an exhibit to our opposition to the motion for summary

6    judgment a copy of the <u>WorldCom</u> policy.   We submit that if you

7    compare the relevant language, it's clear that the language in

8    the Axis policy is different.   <u>WorldCom</u> policy says that the

9    insurer shall advance defense costs, then says in a separate

10   place, they must advance defense costs.   There's no requirement

11   or no indication that those defense costs must be covered.   The

12   language in the Axis policy that makes the Axis policy

13   materially different is the word "covered."   And, Your Honor,

14   frankly based on, you know, years and years of court

15   interpretations that word "covered" has a meaning.   It has a

16   meaning to anyone who purchases insurance, anyone who writes an

17   insurance policy.   The word "covered" has a meaning.   It can't

18   just be deleted and excised from the policy, which is really

19   what the insureds would like Your Honor to do.

20          And, you know, the way the word "covered" has been

21   interpreted is that you must look at the insuring agreement.

22   The insuring agreement has to be triggered.   Then you look at

23   the exclusions and what's left after you look at the insuring

24   agreement minus exclusions is what's covered, so the Court must

25   look at both.   There must be a trigger of the insuring

13

1   agreement and the complaint must not fall within the

2   exclusions.

3            Your Honor has previously ruled that Axis's request

4   that the exclusions be considered has to be litigated

5   elsewhere.  It can't be litigated now.  It overlaps with the

6   underlying securities case and, you know, so Axis is precluded

7   on that basis from litigating the applicability of the

8   exclusions.  But I think Your Honor hit it right on the head

9   when you asked, what is in the record by these insureds to show

10  that the exclusions don't apply.  We submit it's their burden

11  on summary judgment to make that argument and that argument has

12  not been advanced.

13           In fact, we've made the argument that based upon the

14  (8)(k) where Refco essentially admitted that there were

15  undisclosed receivables that disclosed -- that admission is an

16  admission of guilty knowledge on the part of Mr. Bennett.

17  Mr. Bennett signed the warranty.  Mr. Bennett, you know,

18  warranted to the insurer that there was no information at the

19  time he signed that warranty on behalf of all of the insureds,

20  that he had any knowledge or any potential claims.

21           Your Honor has already ruled that we can't get into

22  that and so, you know, we haven't extensively briefed that, but

23  certainly these insureds have not put anything before the Court

24  to support their position that defense costs should be covered.

25           THE COURT:  Well, let me explore that a minute.  The

14

1   Klejna group has done that, right?  They say in their
2   complaints, which they attach, their cross-claims, that Axis
3   inserted the knowledge exclusion after the fact improperly.
4   They also say that the issue of the fraud and its imputation to
5   any of the insureds is at issue in the District Court
6   litigations.

7         MS. GILBRIDE:  Your Honor, that is absolutely in
8   their counterclaim.  It's our understanding based upon your
9   prior ruling that those issues were either not to be explored
10  at this point, but they certainly have not been advanced for
11  summary judgment purposes.

12        THE COURT:  Well, no, but I'm going to get to that in
13  a second.  I mean, is there any doubt from the record -- and I
14  guess I was thinking about the question I asked Mr. Walsh, his
15  clients did move, as did Mr. Eisen's clients, to dismiss Axis's
16  complaint on the basis of the overlap doctrine.  Those motions
17  to dismiss are in the record and they state that the issues on
18  fraud and the warranty will be determined in the District Court
19  actions.

20        So I think their point is that once the Court sees
21  that there is a dispute as to coverage and/or the applicability
22  of an exclusion and/or the right to rescind, the advancement of
23  defense costs needs to continue until that dispute is resolved
24  by judicial order, and I think that's their point rather than
25  that it has to be resolved now.

1          MS. GILBRIDE:  Well, Your Honor, we disagree with

2     that point.  We believe that in order to prevail on summary

3     judgment with respect to advancement, the insureds -- all the

4     insureds have to show that the defense costs are covered and to

5     show that there is coverage there has to be not only a trigger

6     of the insuring agreement, but also there -- the exclusions

7     must not apply, so I think their argument puts the cart before

8     the horse.  There has to be --

9          THE COURT:  What case supports that?

10          MS. GILBRIDE:  Your Honor, I think if you look at the

11     Carlin Equities case, I think if you look at the Tyco case, I

12     think if you look at Schiff v. Flack, which is a New York Court

13     of Appeals in 1980, it's clear that the word "covered" is

14     construed --

15          THE COURT:  No, I'm talking about the more narrow

16     issue, which I think is the issue here, which is the issue of

17     whether there's an ability to withhold defense costs pending

18     the determination of a coverage dispute.

19          MS. GILBRIDE:  As far as Axis is aware, the only case

20     that we've been able to find that deals with the precise

21     language in the Axis policy, and I don't think it answers the

22     question that you've just raised, is the Carlin Equities case.

23     I don't believe that there is a case.  I'm not aware of any

24     case that addresses that precise question, but we believe that

25     the language of the policy, and based upon contract

16

1  interpretation principles and insurance contract interpretation

2  principles that our argument, which is that you have to look at

3  those, the insuring agreement and the exclusions is supported

4  by those principles and by, you know, case law which doesn't

5  just deal precisely with this factual scenario, but it deals

6  with the contract interpretation of principles that must --

7  that have to guide the Court's interpretation.

8           THE COURT:  Okay.

9           MS. GILBRIDE:  And, you know, again just to emphasize

10  in the WorldCom case, the posture of that case before the

11  District Court was entirely different than we're in.  In that

12  case, the insurers were seeking to rescind the policy and there

13  was no dispute as to coverage, so I don't believe that there's

14  any case that supports the position that's being advanced by

15  the insureds either.  It's simply an issue that perhaps

16  precisely has not been addressed.

17           Your Honor, we believe our interpretation of the

18  policy is reasonable.  We think, you know, under basic contract

19  interpretation principles that the Court should enforce the

20  policy as written and on that basis we believe that the motion

21  for summary judgment should be denied.

22           THE COURT:  Okay.  On the contract interpretation

23  principles, you didn't really address this I think in your

24  brief, but I'll give you a chance to address it now: what is

25  your response to the statement in the movants' papers in which

1   they rely upon <u>WorldCom</u>, as well as three Second Circuit

2   opinions which state that, in the absence of extrinsic

3   evidence, where there is an ambiguity, it must be read against

4   the insurer?

5          MS. GILBRIDE:  Your Honor, I think we've cited

6   several Second Circuit cases which make it clear that if intent

7   is a question of fact, if there's a dispute as to intent, if

8   there are two reasonable interpretations of a policy that that

9   is a question of fact that precludes summary judgment.

10         THE COURT:  But are those insurance company cases

11  that deal with this where there was no evidence of any -- no

12  extrinsic evidence for interpreting an ambiguity?

13         MS. GILBRIDE:  Yes, Your Honor.  We've cited

14  insurance company case -- the <u>Parks</u> case, Second Circuit case,

15  and several other cases we cited deal with the interpretation

16  of insurance contracts and those courts hold that if intent --

17  well, they say that if there's -- if the Court finds that

18  there's an ambiguity, that the Court must look at extrinsic

19  evidence.  We've not made this motion for summary judgment.

20  The insureds have.  It's their burden to establish one way or

21  the other whether there's an ambiguity or not an ambiguity.

22  They've taken inconsistent positions on that, but if the Court

23  finds there's an ambiguity, the Court is obligated to look at

24  extrinsic evidence.  It's not our burden to put that extrinsic

25  evidence before the Court.

18

1          Our position is that there's no ambiguity, Your

2   Honor.  Our position --

3          THE COURT:  Let me explore that.  Why do you say that

4   it isn't your burden to put extrinsic evidence before the

5   Court, given the statements in the case law that say that in

6   the absence of extrinsic evidence an ambiguity will be

7   construed against the insurer?

8          MS. GILBRIDE:  Your Honor, our fundamental position

9   and the position we've advanced from the beginning of this case

10  is that the policy language is clear and unambiguous.

11         THE COURT:  No, I understand that point, but I'm just

12  going to the other point.

13         MS. GILBRIDE:  Okay.  So the insureds have argued or

14  some of the insureds have argued that there may be an

15  ambiguity.  I think essentially that's what they're saying and

16  I am not aware of any case law that says it's the insurer's

17  obligation to establish the insured's argument that there's an

18  ambiguity.  Our position is that there's no ambiguity.

19         And if they want to argue that there is an ambiguity,

20  I think it's their burden to put that information before the

21  Court.  Just for the record, it's not our -- the primary policy

22  with this language, which we are arguing is clear and

23  unambiguous was not a policy drafted by Axis, so we don't

24  have -- it was drafted by another insurer, the primary insurer,

25  so we don't have Axis without, you know, subpoenas or, you

19

1  know, some discovery to find out what exactly was in the mind

2  of the drafter and that's the type of discovery that would

3  normally occur if the Court was to find there was an ambiguity.

4           This -- you know, we're before Your Honor on a very

5  expedited schedule, on a very fast pace, and that's all been at

6  the request of the insureds.  Our position is if we -- you

7  know, we think the language is clear.  We don't think it's

8  ambiguous, so we don't want to point to extrinsic evidence to

9  support their position.

10          THE COURT:  Okay.

11          MS. GILBRIDE:  Do you have any other questions for

12  us, Your Honor?

13          With respect -- I think Your Honor is aware of this,

14  but the other argument advanced by Mr. Klejna's counsel that

15  the carriers below us had the same language and that they --

16          THE COURT:  They don't have the exclusion you have.

17          MS. GILBRIDE:  Exactly.  I don't think I have

18  anything else.  Thank you, Your Honor.

19          MS. KIM:  Well, Your Honor, just briefly.

20          THE COURT:  Well, I'm sorry, but --

21          MS. KIM:  Oh, I'm sorry.

22          THE COURT:  Is there any issue -- if I ruled in favor

23  of the movants here, what would be the consequence?  It would

24  be payment, right?

25          MS. GILBRIDE:  Yes, Your Honor.

20

1          THE COURT:  Okay.  All right.  You can go ahead,

2    Ms. Kim.

3          MS. KIM:  Well, Your Honor, it's our position the --

4    that the terms of the policy are clear and unambiguous and that

5    if there were a -- that there is no provision in the policy

6    that gives Axis the unilateral right to make an initial

7    determination of the application of an exclusion.  In fact, I

8    was reminded of that commercial from the '80s, "Where's the

9    beef?"  They kept saying the terms -- this policy expressly

10   provides that Axis can make that initial determination.  I

11   don't see that anywhere.  They haven't cited any provision

12   anywhere.

13         We believe that in order to have a second sentence of

14   condition (d)(2) apply, the recoupment provision, the repayment

15   provision, the only way that provision ever has any meaning

16   whatsoever is if Axis has an obligation to pay defense costs

17   that are disputed until there is a final determination of no

18   coverage.  Otherwise, Your Honor, they would never -- they

19   could simply disclaim coverage.  They would never even have to

20   reserve -- pay defense costs under a reservation of rights.

21   That scenario would never arise, because under their reading

22   they could just disclaim coverage and there would never be any

23   advancement of disputed defense costs, Your Honor.

24         So we believe it is their burden to come forward with

25   extrinsic evidence.  They didn't do so, and therefore we

21

1  believe that the contractual interpretation is clear.  There

2  has to be advancement of defense costs until there is a final

3  determination -- excuse me -- of no coverage.

4        We note that in the Carlin Equities case there was a

5  determination with respect to the application of an exclusion

6  for one of the insureds.  That was Mr. Mochweller [Ph.].  But

7  that was a determination made on summary judgment from the face

8  of the pleadings.  The reason he was excluded was because it

9  was -- he was admittedly not an officer or director of Carlin

10 and he didn't fall within the management carve-back provision.

11 That was a determination that the Court could make from the

12 face of the pleadings to which there was no dispute.  And I

13 believe that Axis also raised -- posited a problem, an issue.

14 They said, well, the policy also has -- the Axis policy has an

15 exclusion for any case arising out of the McElreath [Ph.] case.

16       Well, if we had submitted and tendered a case that

17 was squarely brought into issue, the allegations of the

18 McElreath case, they could have moved for summary judgment on

19 the face of the pleading saying, no, that's not covered, but

20 they can't do that here, Your Honor.  They have not crossed

21 move for summary judgment, because there is a disputed question

22 as to the underlying coverage applicability of exclusion and I

23 agree with Mr. Walsh's two-part test.

24       If there is an exclusion and the Court cannot

25 determine from the face of the pleadings that the underlying

22

1  action falls entirely within the scope of that exclusion, then

2  the burden remains on the carrier to advance until that

3  underlying question is resolved in the underlying action.

4          MS. GILBRIDE:  Your Honor, can I just address some of

5  the arguments that have been advanced?

6          THE COURT:  Well, does anyone else have any response

7  on it before I hear from Ms. Gilbride?

8          MR. WALSH:  Just a couple of little things, Your

9  Honor.  Michael Walsh, Weil, Gotshal.

10          You asked me a question earlier about, you know, is

11  there facts in this record about the director defendants

12  denying that the exclusion applies.  I'm still not sure if

13  that's, you know, relevant to the discussion but it is a matter

14  of judicial record that we have filed answers to, you know, the

15  complaints in the underlying action where we did deny all those

16  allegations.

17          On point of ambiguity, we're certainly not arguing

18  that the language is --

19          THE COURT:  I'm sorry, did you answer?  I thought you

20  moved to dismiss.  Did you answer also?

21          MR. WALSH:  In the underlying actions.

22          THE COURT:  Oh, I understand.  All right.  The

23  federal -- the District Court actions?

24          MR. WALSH:  yes.

25          THE COURT:  All right.

23

1          MR. WALSH:  On the issue of ambiguity, we're not

2    taking the position that the language is ambiguous.  We think

3    it is unambiguous, but if the Court has to get to that issue,

4    we think that it -- that Rule 56(e) requires Axis to say

5    something about it.  This was their policy.  It's not like

6    advancement is some little tiny provision, you know, in the

7    fine print.  Advancement is sometimes that's the whole purpose

8    of the contract.  Though they were not the drafters of the

9    primary policy, they signed onto the terms of the primary

10   policy.  They've got anything whether it's -- what their intent

11   was, they should have come forward and they didn't, so I think

12   having failed to do that, Your Honor, you could go on -- you

13   could if you were so inclined rule in our factor in terms of

14   summary judgment based on ambiguity, but that's not our

15   argument.

16          THE COURT:  Okay.  Okay.  I think they're done.

17          MS. GILBRIDE:  Okay.  Sure.  Just addressing a couple

18   of things that Ms. Kim argued, Your Honor.

19          She argued that the second sentence of (d)(2) would

20   be superfluous if our position with respect to the first

21   sentence was adopted by the Court.  That's just not accurate.

22          The second sentence of (d)(2) applies in a situation,

23   the exact situation that the primary and first Axis carriers

24   are in where they have advanced defense costs subject to a

25   reservation of rights based on other exclusions, not the same

24

1  exclusions as us, which require that there be an adjudication

2  in fact of the issues in those exclusions.

3        So the purpose of the second sentence of (d)(2) is

4  for those situations where an insurer says, well, we don't

5  think there's coverage but we can't make that determination now

6  based upon the language in those exclusions so we will advance

7  defense costs subject to a reservation of rights and subject to

8  recoupment later if there is an adjudication that satisfies the

9  language of those exclusions.

10       The exclusions that Axis is relying upon do not have

11  that language and, in fact, the argument that's being advanced

12  by the insureds, by some of the insured is -- would make that

13  second sentence of (d)(2) superfluous and it would make the

14  language of the exclusions that require an adjudication in fact

15  superfluous.  Their argument -- so in order to reach the

16  conclusion that they're advancing you'd have to ignore the word

17  "covered" before defense costs and you'd have to ignore the

18  other provisions in the policy which provide mechanisms for

19  reimbursement in the event that there is an exclusion which

20  requires an adjudication in fact.

21       And, you know, then there's (d)(3), Your Honor,

22  which, you know, if you adopt the argument that the insureds

23  are advancing basically it would have been in Axis's interest

24  to say, well, we think one percent of this case is covered, so

25  we'll advance one percent of the defense costs.  And they would

25

1   say, well, 100 percent is covered; (d)(3) would only require us

2   to advance undisputed defense costs and that can't be the way

3   that this works.  That just makes no sense whatsoever.

4           THE COURT:  Although that's how the District Court in

5   the Rigas [Ph.] case determined it.

6           MS. GILBRIDE:  Your Honor, I don't think -- I'm

7   positive that the Rigas policy language did not have the word

8   "covered defense costs."  That was not there.

9           THE COURT:  But on that point, I mean, all of these

10  policies, including the WorldCom policy, allowed the insurer to

11  make the argument that this wasn't covered in some way or

12  another, either in the definition of a "loss" or "injury"

13  because it's a loss "under the policy" and so I just -- I'm of

14  a mind that you're putting too much weight on the word

15  "covered," because an exclusion is an exclusion.  I mean, you

16  don't have to say to someone else "if we really meant it, it's

17  an exclusion" and these cases all deal with exclusions and say,

18  well, if there's an issue about an exclusion, then sorry,

19  insurer, you have to wait until that's determined and advance

20  the defense costs beforehand.

21          MS. GILBRIDE:  Well, Your Honor, I think that that is

22  the position that most insurers thought was the law before you

23  had WorldCom and Tyco.  And I think if we do get into extrinsic

24  evidence, it will be very clear that the word "covered" was put

25  right where it was based upon the court interpretations that an

26

1  insurer could not rely upon its own interpretation of its own
2  policy language.  So that word "covered" is significant.
3         THE COURT:  But is there any -- but that's just
4  speculation, right?
5         MS. GILBRIDE:  I -- yes.
6         THE COURT:  Okay.
7         MS. GILBRIDE:  It is not -- it is speculation.
8         THE COURT:  All right.
9         MS. GILBRIDE:  But it's based upon knowledge of, you
10  know, how these policy language have -- policy provisions have
11  developed.
12         THE COURT:  Well, no one has asserted that, though.
13         MS. GILBRIDE:  I'm not an expert witness.  I'm not
14  here before the Court as an expert witness.
15         THE COURT:  Okay.
16         MS. GILBRIDE:  No.
17         THE COURT:  Well -- all right.
18         MS. GILBRIDE:  But I think that -- I think that
19  you're right that insurers thought that that was the way it
20  worked.
21         THE COURT:  I didn't say that.
22         MS. GILBRIDE:  Before -- well, I think that, you
23  know, it was a reasonable interpretation of the WorldCom policy
24  to think that if there was an exclusion advanced that you could
25  rely upon your interpretation of the exclusion and there was no

1  need to use the word "covered" before defense costs.

2          So if you will, the word "covered" was inserted to

3  make it triply -- you know, very clear to anyone who looks at

4  it --

5          THE COURT:  Well, again, I --

6          MS. GILBRIDE:  -- that in order for there to be

7  advancement --

8          THE COURT:  I mean, if it's on its face, if it's

9  really clear, I mean, again, I go with the judge in the Rigas

10 case.  He seemed to think that you needed to be a lot clearer

11 than that, and then he made his somewhat offhand remark that

12 perhaps the insurers didn't do that because it would affect

13 their ability to sell policies, but --

14         MS. GILBRIDE:  Your Honor, I read that dicta as well.

15 You know, of course, I read that.  I don't think that, you

16 know, it's neither really here nor there nor the issue that we

17 have today.

18         THE COURT:  Okay.

19         MS. GILBRIDE:  You know, our position is that the

20 language is clear.

21         With respect to Mr. Walsh's position with respect to

22 the -- whether they've denied that the exclusion applies, I

23 don't think that there's -- I'm not aware of anything in the

24 underlying action that involves the exclusionary language.  I'm

25 certain that his clients have denied that there's a fraud, but

28

1 I don't think that that is enough evidence to establish that
2 they've denied that the exclusion applies.

3          THE COURT:  Well, but didn't they say in their motion
4 to dismiss that under the overlap doctrine I couldn't decide
5 this coverage issue because the underlying issue of the fraud
6 was at issue in the District Court actions?

7          MS. GILBRIDE:  They did.  They did make that
8 argument.

9          THE COURT:  Okay.

10          MS. GILBRIDE:  Our position is not -- is not based on
11 fraud.  We don't -- you know, we're not basing our coverage
12 position based upon a fraud exclusion.  It's based upon a prior
13 knowledge exclusion and a warranty.

14          THE COURT:  But it's a prior knowledge of fraud.

15          MS. GILBRIDE:  It's a prior knowledge of facts or
16 circumstances that could lead to a claim.  It doesn't have to
17 be prior knowledge of a fraud.  It so happens that in this case
18 apparently -- you know, there are allegations that it was
19 apparently a fraud, but that's not what the exclusion or the
20 warranty letter said.  It's just knowledge of acts or
21 circumstances.

22          THE COURT:  All right.  But there -- I mean, there's
23 no dispute that it has to be wholly within the exclusion to be
24 excluded, right?  I mean, the cases are pretty clear on that.

25          MS. GILBRIDE:  Yes, Your Honor.

29

1          THE COURT:  So, for example, if there's a dispute

2   about fraud and there be one of the counts, of the ones that

3   are being sued, is a fraud suit, then it would seem to me it

4   would -- they'd be denying it, but the exclusion applies.

5          MS. GILBRIDE:  Well, I don't read it that way, Your

6   Honor, but --

7          THE COURT:  Okay.  Can I turn to the cross-motion for

8   a declaration that if I were to grant the movants' motion, the

9   insureds' motion, it's subject to refund?

10          MS. GILBRIDE:  Yes, Your Honor.  That's an argument

11   that Axis is advancing.

12          THE COURT:  What is -- I mean, is -- it's not -- to

13   me it doesn't seem to be an issue now, so you have to, I think,

14   rely on the other basis for a declaratory judgment that somehow

15   your actions are adversely affected by not knowing the answer

16   to that question.  I just -- how would that -- how is that the

17   case here?

18          MS. GILBRIDE:  Well, Your Honor, we believe that Your

19   Honor made it clear that you could interpret the policy.  You

20   could construct the policy as a matter of law.  We're simply

21   asking the Court to construct the policy the same provision

22   that the insureds are relying upon to say that they -- that

23   defense costs should be advanced, that if they are advanced,

24   they should be repaid if there's an ultimate determination.

25          THE COURT:  Well, but the issue is whether it's ripe

1  to do that at this point.

2          MS. GILBRIDE:  Well, it's certainly Axis's position

3  that the issue is ripe.  You know, Axis is being asked to

4  advance defense costs where Axis's position is if there's no

5  coverage for the defense costs and Axis issued a policy that

6  says in that situation a second sentence of (d)(2) that if

7  there is an ultimate determination that there's no coverage

8  that Axis is entitled to repayment.

9          THE COURT:  But why -- well, why is this different

10 than cases like WorldCom and Koslowski?  Well, or the G-1

11 Holdings case, where the courts all say as part of their

12 analysis of the contract that the bargain here was to advance

13 the defense costs subject to reimbursement under the provision

14 which has the same language in it essentially that this

15 contract has in (d)(2) that if it's later determined that it

16 wasn't covered that it be reimbursed.  I mean, that -- those

17 weren't declaratory judgments.  Those were statements as part

18 of the rationale of the court's decision in interpreting the

19 contract.

20          My question goes to why does -- why should I be

21 issuing a declaratory judgment on top of that when I don't

22 know, for example, when there's no request or no refusal -- put

23 it that way, no refusal, first, and then no request to enforce

24 the contract in light of the refusal, to refund the advanced

25 defense costs?

31

1          MS. GILBRIDE:  Just addressing your first question,

2    Your Honor, I don't know that a declaratory ruling was

3    requested in those cases that Your Honor is referring to, so

4    for that reason it may not have been addressed by those courts.

5          THE COURT:  Right.

6          MS. GILBRIDE:  Our position is that just simply based

7    upon the Court's inherent power to interpret these insurance

8    policies that Your Honor has the power to say that in the event

9    that it is finally determined that these defense costs are not

10   covered, that they should be reimbursed.

11         THE COURT:  Okay.

12         MS. GILBRIDE:  And it's based upon, you know, the

13   federal declaratory judgment action.

14         THE COURT:  Well, I guess that's where I'm having a

15   problem.  I don't see how it is really based on the federal

16   declaratory judgment statute since there's no immediate

17   controversy and I'm not hearing any argument that there's the

18   type of doubt in Axis's mind that the contract wouldn't be

19   interpreted the way Axis says it should be interpreted.  I

20   mean, no one's --

21         MS. GILBRIDE:  Well, there's a lot of doubt in Axis's

22   mind about that, Your Honor.

23         THE COURT:  Well, where is that stated?  I didn't see

24   that.  Where is the -- where's that hook under the declaratory

25   judgment act?

1      MS. GILBRIDE:  Your Honor, I think if you look at the

2  broad powers that are enumerated in that statute, that would --

3  you know, it's our position that Your Honor does have the power

4  to issue --

5      THE COURT:  All right.  I know you said that.

6      MS. GILBRIDE:  -- that sort of --

7      THE COURT:  But I'm not satisfied by that.  I need to

8  hear why I need to do it, because I think I only really have

9  the power if I need to do it.

10      MS. GILBRIDE:  Your Honor, we've, you know, cited in

11  our papers the relevant provisions of the statute.  If Your

12  Honor doesn't agree with that cite, you know, I don't know what

13  more I can say to convince Your Honor of that.

14      THE COURT:  Okay.  All right.  Okay.

15      MS. MOSES:  Barbara Moses, Your Honor.  I represent

16  Mr. Trosten.  Very briefly, just on the last point, the cross

17  motion for an additional declaration of rights under the

18  policy.  What Your Honor said was that you didn't think you had

19  the power to do it unless you needed to do it and I think

20  that's exactly right.  I would approach this issue not so much

21  from the point of view of ripeness, but more fundamentally from

22  the question of whether there is even a justiciable controversy

23  here.  That's a constitutional requirement before a declaratory

24  judgment may be issued.  Since there has been no demand for

25  repayment, no refusal to repay, no showing or suggestion of

33

1    anything other than a doubt in counsel's mind as to whether

2    such a dispute ever would develop in the future, I don't think

3    we have a justiciable controversy here.  Thank you.

4          THE COURT:  Okay.

5          MR. KLINE:  Your Honor, Ivan Kline for Sexton and

6    Sherer.  I think Your Honor has already recognized that

7    Ms. Gilbride's statement was just pure speculation, but just so

8    the record is clear, it's not only speculation but on the face

9    of the document she submitted it's -- herself to the Court --

10   it's wrong in terms of the sequence of how the word "covered"

11   arrived in this policy, since in the Carlin Equity case that

12   she -- that she submitted on Wednesday, the court made clear

13   that that -- which is the identical policy language in the

14   identical primary carrier, that policy was written in 2003, so

15   the language that started here in August 2005 was not a

16   response to WorldCom and Koslowski.  It appeared in 2003 and

17   was continued following the Koslowski decision in 2004 and the

18   WorldCom decision in February 2005.

19         THE COURT:  Okay.

20              [Pause in the proceedings.]

21         THE COURT:  Where's the date of that policy stated in

22   here in the Carlin opinion?

23         MR. KLINE:  The very first paragraph of the opinion,

24   Your Honor.  It says in 2003 Carlin purchased a directors &

25   officers [ph.] and that is the policy where the -- on the

34

1    same -- I think Houston Specialty -- Houston Cad [Ph.], I

2    believe, is the same company as U.S. Specialty.

3                THE COURT:  Okay.

4                MR. KLINE:  It's the same language that is in the

5    primary policy.

6                THE COURT:  Okay.

7                MS. GILBRIDE:  Your Honor, it was pure speculation on

8    my part.

9                THE COURT:  Okay.  All right.

10                   [Pause in the proceedings.]

11                THE COURT:  All right.  I have before me in this

12   adversary proceeding motions for summary judgment in respect of

13   the claim that Axis Reinsurance Company is obligated to advance

14   defense costs to the insured's under its excess liability

15   policy on behalf of directors and officers of Refco, Inc.

16                The movants, all former directors and officers or

17   officers of Refco, are Messrs. Klejna, Sexton, Sherer,

18   Silverman, and Murphy, Messrs. Brightman, Gantcher, Harkins,

19   Jackel [Ph.], Lee, O'Kelley and Shone [Ph.] and Messrs. Grant,

20   Trosten and Bennett.  I believe that includes all the moving

21   insureds.

22                Federal Rule of Civil Procedure 56(c), which is made

23   applicable in bankruptcy proceedings in bankruptcy cases

24   pursuant to Bankruptcy Rule 7056 controls the standard in

25   respect to these motions for summary judgment.  Rule 56(c)

35

1   provides that summary judgment shall be granted if the

2   pleadings, depositions, answers to interrogatories and

3   omissions on file together with affidavits, if any, show that

4   there is no genuine issue as to any material fact and that the

5   moving party is entitled to judgment as a matter of law.

6   Siltex Corporation v. Cantrent [Ph.], 477 U.S. 317 (322 1986).

7           In deciding a motion for summary judgment, the Court

8   must determine if there are any material factual issues to be

9   tried while at the same time since the nonmoving party would be

10  precluded from a trial if the relief were granted the Court

11  should resolve ambiguities and draw reasonable inferences in

12  favor of the party opposing the motion.  Matsushita v. Zenith

13  Radio Corporation, 475 U.S. 574 (587 1986); Knight v. U.S. Fire

14  Insurance Company, 804 F.2d 911 (2d Cir. 1986).

15          The burden ultimately rests on the moving party to

16  establish the absence of a genuine issue as to any material

17  fact, Siltex 477 U.S. at 322-23.  The nonmoving party may

18  oppose a summary judgment motion by making a showing that

19  there's a genuine issue as to a material fact in support of a

20  verdict for that party, Anderson v. Liberty Lobby, Inc., 477

21  U.S. 242 247-48 (1986).  That is the mere existence of a

22  scintilla of evidence in support of its position will be

23  insufficient.  There must be evidence on which a jury could

24  reasonably find for the nonmoving party.  Id.

25          That is, the nonmoving party may not defeat a summary

36

1  judgment motion by relying on self-serving or conclusory

2  statements.   There must be something more than some

3  metaphysical doubt as to a material fact.   That is, there needs

4  to be specific evidence of a material fact at issue, although

5  of course once that evidence is shown, the Court moves on to

6  the trial stage, that is, the evidence need not be probative at

7  the summary judgment stage.   See generally again, Matsushita v.

8  Zenith, 475 U.S. at 586.

9           In this case the question before the Court is whether

10 there's a genuine issue of material fact as to whether Axis'

11 unilateral decision to deny payment of defense costs to the

12 plaintiff insured's was a breach of the Axis policy.   In

13 determining that issue on summary judgment, the parties have

14 directed me primarily to rely upon the terms of the policy and

15 in particular the terms of the provision governing the

16 advancement of defense costs, paragraph (d)(2), as well as

17 various claims claimed, exclusions to the policy.   They have

18 submitted their statements of undisputed material facts and in

19 Axis's case a response in certain instances controverting those

20 statements.

21           In reviewing that record, it is clear to me that

22 primarily this is a dispute upon which the Court must focus on

23 the language of the relevant provisions of the insurance

24 policy.   Accordingly, this falls into the category as noted by

25 numerous courts that summary judgment is a particularly

37

1  appropriate vehicle for determining insurance coverage

2  disputes.  See <u>United Capital Corporation v. Travelers</u>

3  <u>Indemnity Company of Illinois</u>, 237 F. Supp. 2d 270, (274

4  S.N.D.Y. 2002).  And that is because generally insurance

5  company disputes hinge, as this one does, on the terms of the

6  contract and contract determination generally leads itself or

7  lends itself to summary judgment analysis.

8        I previously determined in this proceeding that the

9  dispute in particular the interpretation of the contract under

10  the dispute is governed by New York law having applied in New

11  York law, choice of law analysis and determined, as I set forth

12  on the record of the hearing on August 30, 2007, that New York

13  choice of law principles given the locus of the dispute and

14  generally speaking the domicile of the parties would lead to

15  New York applying.

16        That transcript is attached to the parties

17  submissions, both Ms. Kim's declaration as well as

18  Ms. Gilbride's declaration in support of Axis's cross motion at

19  Exhibit B.

20        Under New York law generally a contract -- a written

21  contract is to be interpreted so as to give effect to the

22  intention of the parties as expressed in the unequivocal

23  language they've employed, <u>Kruden v. Bank of New York</u>, 957 F.2d

24  961 (976 2d Cir. 1992).  Under New York law if a contract is

25  unambiguous on its face its proper construction is a question

38

1    of law.  The Court should not look beyond its confines to

2    extrinsic evidence if its relevant provisions are clean and

3    unambiguous.  See generally <u>Metropolitan Life Insurance Company</u>

4    <u>v. RJR Nabisco, Inc.</u>, 906 F.2d 884 (889 2d Cir. 1990); <u>WWW</u>

5    <u>Associates, Inc. v. Gencontiari</u> [Ph.], 77 NY 2d 157 (162 1990);

6    and <u>Vermont Teddy Bear Company, Inc. v. 538 Mass Realty</u>

7    <u>Company</u>, 1 NY 3d 470 (2004).

8         Giving the terms of the contract their plain meaning,

9    a court should find contractual provisions ambiguous only if

10   they are reasonably susceptible -- if they are reasonably

11   susceptible to more than one interpretation by reference to the

12   contract alone.  <u>Crummy v. Westpoint Stevens, Inc.</u>, 238 F.3d

13   133 (139 2d Cir. 2000).  Contract language is unambiguous if it

14   has a definite and precise meaning unintended by danger of

15   misconception in the purport of the contract itself concerning

16   which there's no reasonable basis for difference of opinion.

17   <u>Metropolitan Life Insurance v. RJR Nabisco</u>, 986 F.2d -- excuse

18   me -- at 889, language whose meaning is otherwise plain is not

19   ambiguous merely because the parties urge different

20   interpretations in the litigation.  Id.

21        Those contract interpretation rules are generally

22   followed in New York in respect of insurance policies, but in

23   addition to those general principles there are specific

24   contract interpretation rules that apply to insurance policies

25   that are relevant to this dispute or potentially relevant.

39

1          With regard to the first proposition that with regard

2    to the interpretation of the insurance contract, the courts

3    view the plain language of the contract as the best and if

4    plain the only measure of the parties intentions and that the

5    initial interpretation of the contract is a matter of law for

6    the Court to decide is set forth in among other decisions cited

7    by the parties.  In Re:  <u>WorldCom, Inc</u>, <u>Securities Litigation</u>,

8    354 F.Supp. 2d 455 at 463 (464 S.D.N.Y. 2005).

9          However, in that opinion District Judge Cote goes on

10   to state real established rules with regard to insurance

11   contracts, in particular in New York.  That is, first that to

12   the extent an ambiguity exists in respect of an insurance

13   contract governed by New York law and is unresolved by

14   extrinsic evidence, such ambiguity is read against the insurer.

15   See also <u>Nekostis v. Home Insurance Company of Indiana</u>, 31 F.3d

16   910 (113 2d Cir. 1994).  Going on, Judge Cote says the rule

17   that insurance policies are to be construed in favor of the

18   insured as most rigorously applied in construing the meaning of

19   exclusions incorporated into a policy of insurance or

20   provisions seeking to narrow the insurer's liability.

21          Finally, under New York law where a contract of

22   insurance includes the duty to defend or to pay for the defense

23   of its insured and I note that Judge Cote makes no distinction

24   between the two concepts, *i.e.,* duty to defend or duty to pay

25   for the defense of its insured, that duty is "a heavy one" and

40

1    indeed has been found for many years to apply even if the

2    policy of indemnity does not specifically provide for

3    advancement.

4           "In sum" -- again, I'm quoting from the <u>WorldCom</u>

5    opinion at page 464 -- "the duty to pay defense costs is

6    construed liberally and any doubts about coverage are resolved

7    in the insured's favor."  My review of Axis's statement of

8    additional facts and response to statement of undisputed

9    material facts submitted in response to various of the movants,

10   Rule 7056(1) statements that most of the issues in this case

11   are uncontroverted, obviously, the terms of the underlying

12   policy which incorporates with the specific exceptions stated

13   in the Axis policy the primary policy issued by the primary

14   insurer.

15          In addition, Axis does not dispute that the

16   underlying litigation against the insureds constitutes claims

17   as a defined term for wrongful acts as defined in the primary

18   policy or that the movants here are insured or are insureds or

19   that they have incurred and will continue to incur defense

20   costs under -- or in response to the underlying litigations.

21          There's also no dispute and of course the policy

22   speaks for itself that the term "loss" in the primary policy as

23   incorporated with specific exceptions by the Axis policy

24   includes defense costs and insured person is legally obligated

25   to pay as a result of any claim.  It's also not disputed that

41

1  the insureds have given Axis notice on a timely basis of their

2  claim of the policy.

3          What is disputed by Axis is first whether exclusions

4  unique to its policy, which I primarily take to be the prior

5  knowledge exclusion set forth in endorsement number six to the

6  policy, but also other potential exclusions and defenses apply

7  here to prevent the defense costs from being covered under the

8  policy.

9          In addition, the parties dispute whether under the

10  language of the primary policy specifically paragraph (d)(2)

11  Axis is obligated to pay defense costs on an as-occurred basis

12  in light of its contention that the exclusions that it has

13  noted apply and preclude coverage.  The issue was first raised

14  by Axis.  Apparently in a letter attached Exhibit 9 to the Kim

15  declaration disclaiming coverage on the basis of various

16  disclusions -- exclusions as well as breach of warranty.

17          Notably, Axis has not offered any material fact as to

18  any extrinsic interpretation of paragraph (d)(2) that I've

19  referred to or any other provision for that matter of the

20  applicable insurance policies.

21          I conclude based on the record before me for purposes

22  of these motions that, in fact, there is a dispute as to

23  whether the policy exclusions would apply here to render the

24  losses including defense costs not covered by the policies.

25  Specifically, each of the movants, each of the insureds has in

42

1   this adversary proceeding taken the position that it is not

2   precluded from coverage by the knowledge exclusion and

3   furthermore certain of the insureds as set forth in Exhibits

4   10, 12 and 13 of the Kim declaration at paragraphs 43 through

5   45 and in addition taken the position that the knowledge

6   exclusion itself is an improper endorsement to the policy.

7           I previously ruled as is set forth in the transcript

8   of the August 30, 2007 hearing that the issue of whether, in

9   fact, the insured's losses are covered under the Axis policy in

10  light of the prior knowledge exclusion, as well as the other

11  exclusions and defenses raised by Axis, may not be decided at

12  this time in light of the substantial overlap of those issues,

13  *i.e.*, whether in fact there was a prior knowledge of a claim

14  and/or loss.

15          With the issues pending before the District Courts in

16  the multi-district securities litigation as well as in respect

17  to certain of the insureds pending criminal litigation in the

18  Southern District, I won't repeat that ruling now except to

19  note that in my view it was dictated by clear precedent which,

20  as was brought out at the hearing and is set forth in the

21  transcript, essentially puts the interest of the insured in

22  having a prompt determination of such an issue behind the

23  interest of the insured to pursue its defense of the primary

24  litigation that allegedly gives rise to the claim or loss.

25          That context is important to keep in mind, however,

43

1  in connection with the present motions because it sets the

2  stage for the -- what I believe to be fairly narrow issue

3  before me.  Again, that issue ultimately depends upon the

4  Court's interpretation of the following provision, paragraph

5  (d)(2) of the Axis policy which states incorporating the

6  provision from the primary policy, "The insurer will pay

7  covered defense costs on an as-incurred basis.  If it is

8  finally determined that any defense costs paid by the insurer

9  are not covered under this policy, the insured has agreed to

10 repay such noncovered defense costs to the insurer."

11          Axis contends that it is permitted by that language

12 to determine unilaterally not to pay defense costs on an as-

13 incurred basis if it believes that such defense costs are not

14 covered under the policy, that is, that they would be subject

15 to the exclusion or the exclusions under the policy.  The

16 movants contend to the contrary that Axis is obligated under

17 the paragraph that I just read, particularly when construed in

18 light of relevant case law and the presumptions that I noted

19 earlier applying to exclusions and insurance policies generally

20 to mean that until there is a final determination by an

21 objective fact finder that the defense costs are not covered,

22 Axis is obligated to advance them.  They say this again because

23 they contend and I conclude the record supports this that there

24 is a legitimate dispute as to whether defense costs are covered

25 or not under the policy.

44

1        Both sides have asserted principles of contact

2  interpretation or a principle of contract interpretation to

3  assist the Court in determining whether the language that I

4  just quoted is ambiguous or not.  Not surprisingly, they both

5  contend that the language is not ambiguous, although equally

6  not surprising they both contend that it means the opposite of

7  what the other says it means.

8        The principle they relied on primarily is that a

9  court should read a contract in whole giving meaning to all of

10  its parts and avoid interpretation that would render other

11  provisions useless and meaningless and I have looked at the

12  other provisions of the contract, in particular, paragraph 3 as

13  well as the interplay of the two sentences in paragraph (d)(2).

14        Frankly, after having done so, I do not believe that

15  the contract interpretation maxim that I just recited is of

16  much help in that one could conceive of uses for the language

17  in paragraph (d)(2) to support both sides' position.  I believe

18  that (d)(3) is really a provision going to a separate

19  proposition and consistent with, again, the principles pursuant

20  to which courts in New York interpret insurance policies and

21  particularly exclusions to the advancement of defense costs,

22  (d)(3) should be read narrowly and not be used to extend over

23  into interpretation of (d)(2).

24        However, there is a more meaningful point to note

25  about the rest of the policy, which is that nowhere does it

45

1    state that or imply except in (d)(3) in the specific instance

2    covered thereby that the insurer can unilaterally or in the

3    exercise of its reasonable judgment or in any other way

4    withhold defense costs absent a court determination in the

5    event of a dispute as to whether defense costs are covered.

6            In light of the case law that I will go into in a

7    minute, as well as the function of advancing defense costs, I

8    conclude that the absence of such language in addition to the

9    language of (d)(2) says that "The insurer will pay and provide

10   for refund mechanism if noncovered defense costs are finally

11   determined.  "Not to be covered" means that the reasonable and

12   ordinary course colloquial interpretation of paragraph (d)(2)

13   is that absent a final determination by an objective fact

14   finder the insurer is obligated to pay the defense costs

15   notwithstanding its view that those costs are excluded under

16   the policy.

17           As I said, I believe this language is clear in the

18   context of the entire agreement and it's in the absence of that

19   agreement of any provision conferring on the insurer the

20   unilateral ability to make such a determination, but I note to

21   that to the extent that an ambiguity exists the insurer has

22   offered up no extrinsic evidence in support of its position for

23   interpreting paragraph (d)(2).  Consequently, I believe that

24   under the law of New York in the absence of offering up such

25   evidence the ambiguity would have to be interpreted against the

46

1    insurer.  Again, see Macostis v. Home Insurance Company

2    [inaudible], 31 F.3d 110 at 113 2d Cir. 1994, as well as the

3    discussion in Multi-Foods Corporation v. Commercial Liens

4    Insurance Company [Ph.],309 3d 76 (8807 2d Cir. 2002).

5          As I alluded to a moment ago, I'm not writing on a

6    clean slate with regard to this issue.  As far as I can tell,

7    every court that has considered the issue and again I believe

8    it's a narrow issue as to whether during the pendency of a

9    dispute as to coverage under the policy an insurer may withhold

10   the payment defense costs has concluded that to the contrary

11   the insurer is obligated to advance the defense costs with the

12   caveat that if it is clear from the policy itself and claim

13   made against the insured that the claim would not be covered

14   then such an obligation could be decided on a summary judgment

15   basis and no defense costs would need to be advanced.

16         Here as I noted, that issue is not clear.

17   Consequently, I believe that the case law would support my

18   conclusion that Axis is obligated to advance the defense costs.

19   This issue has most recently been dealt with more thoroughly in

20   Federal Insurance Company v. Tico International Limited, 784

21   NYS 2d 920, in which the Court after noting numerous cases that

22   considered the issue in other jurisdictions found that it is

23   "... well settled the duty of insurer to defend its insured or

24   pay its defense costs as distinct from and broader than its

25   duty to indemnify.  The duty exists whether a complaint against

47

1    the insured alleges claims that may be covered under the

2    insurer's policy.  If any portion of a complaint might result

3    in coverage, the insurer must defend or pay defense expenses

4    for all claims, both covered and noncovered.  Conversely, the

5    insurer has no duty if as a matter of law the allegations in

6    the complaint could not give rise to any obligation to

7    indemnify or the allegations fall within the policy exclusion,

8    but the duty to defend or pay defense costs is construed

9    liberally and any doubts about coverage are resolved in

10   insured's favor.  Furthermore, an insurer can only evoke a

11   clause exclusion to avoid coverage if it can show that the

12   allegations in the complaint as to pleading solely and entirely

13   within the policy exclusion."

14          Given the doubt raised by the movants, the insureds

15   in that summary judgment motion as to whether the insurer had

16   met those stringent tests, the Court concluded that pending a

17   final determination of those issues the insurer would need to

18   advance defense costs.  I note that it did so notwithstanding

19   similar facts alleged as to at least one of the defendants

20   alleged fraud which were arguably analogous at least to the

21   conduct of Mr. Bennett.

22          The New York courts have twice since the Koslovsky

23   opinion adopted its rationale, although in one case apparently

24   in dicta in Ghose, G-h-o-s-e, v. CNA Reinsurance Company

25   Limited, 841 NYS 2d 519, Appellate Division First Department

48

1    2007 the Court stated, "We note, however, that the complaints

2    ere not being dismissed on grounds of inconvenient form.  The

3    interim order defense costs would not be disturbed.  New York

4    law requires that a judicial order is a condition precedent to

5    the cessation of payment for defense costs and circumstances

6    where a claim has already been made" citing Koslovsky.

7          Similarly, in Trustees of Princeton University v.

8    National Union Fire Insurance Company of Pittsburgh, 839 NYS 2d

9    437 (Supreme Court, New York County, 2007), the Court after

10   noting many of the same rules of construction that I quoted

11   from the Koslovsky case stated the insureds -- I'm sorry, the

12   insurer's duty to pay defense costs arises when the insured

13   incurs the expenses.  Where coverage is disputed, insurers are

14   required to make contemporaneous interim advances of defense

15   expenses subject to recoupment in the event it is ultimately

16   determined the policy does not cover the claim.

17         A similar finding, albeit in respect of slightly

18   different language was reached by Judge Cote in the WorldCom

19   opinion that I cited earlier.  Axis has attempted to

20   distinguish the WorldCom opinion on two bases, neither of which

21   I conclude succeed.  The first is that Judge Cote was dealing

22   with a defensive rescission as opposed to a specific exclusion

23   in the policy.  I don't accept that distinction because I

24   believe that in either case, the key point was that there was a

25   dispute as to whether there was any obligation to pay on the

49

1  insurer's part.

2          The second basis is that the advancement language in

3  the policy in WorldCom did not contain the word "covered"

4  before defense costs.  And I gather used the word "shall" as

5  opposed to "will" before the word "pay."  But for the same

6  reason that I don't believe the first distinction is

7  meaningful, I don't believe the second one is either.

8          In either case, the issue hinged upon whether the

9  insurer could unilaterally act to withhold payment based on its

10  interpretation of whether it was obligated to pay a coverage or

11  whether the policy was void ab initio.  I believe Judge Cote's

12  logic would apply under either scenario.

13          The issue was addressed -- the issue that I just

14  discussed was addressed expressly by the District Court for the

15  Eastern District of Pennsylvania in Associated Electric and Gas

16  Insurance Services Limited v. Ritas, 382 F. Supp. 2d 685

17  (E.D.P.A. 2004).  Because of a prior Third Circuit opinion, the

18  Court in the Regius case had little trouble finding that the

19  insurer's rescission allegation did not give it the unilateral

20  right to withhold defense costs relying instead upon Little v.

21  MGIC Indemnity Corporation, 836 F.2d 789 (3d Cir. 1987).

22          The Court separately considered however whether a

23  unilateral right existed in respect to advancement of defense

24  costs because of applicable exclusion from coverage including a

25  prior knowledge exclusion, which like this exclusion did not

50

1   require a final adjudication for the exclusion to take effect.

2   As here, however, the Court in the Regius case noted that the

3   prior knowledge exclusion also does not contain any language to

4   suggest that it operates at the discretion of the insurer.

5           In the Regius case, the Court determined that the

6   carriers had a duty to contemporaneously pay defense costs

7   given the language in respect of defense costs and the

8   indemnity policy generally triggering an obligation to pay

9   wherever the insured was legally obligated.  As here, there was

10  no dispute in the Regius case that the insureds owed money to

11  the lawyers defending in civil suits and that this was a legal

12  obligation.  Thus, the carriers had a duty to contemporaneously

13  pay defense costs and it's altered by other language in the

14  policy.

15          The Court concluded that the knowledge exclusion was

16  ambiguous because it settled two different interpretations as

17  to whether a unilateral right was lodged in the insurer and

18  since Pennsylvania law was similar to New York law, it must be

19  construed in favor of the insureds and against the insurers.

20  Here, as I said, I go further and find that the absence of such

21  a provision in light of paragraph (d)(2) means that (d)(2) is

22  not ambiguous, but as I said before based on the absence of any

23  extrinsic evidence offered to clarify any alleged ambiguity,

24  the provision would be construed in favor of the insureds and

25  against the insurer here.

51

1          Two other recent cases from other jurisdictions which

2    generally have the same basic insurance law contract

3    interpretation principles also worth noting, first, G-1

4    Holdings, Inc. v. Reliance Insurance Company, 2006 U.S.

5    District Lexus 17597, District of New Jersey, March 22, 2006,

6    where the Court concluded that although the defendants argue

7    that various exclusions operate to bar the potential that the

8    underlying claims will be covered, "An insurer's duty to defend

9    is determined by comparing the allegations of the underlying

10   complaint with the language of the policy at issue.  Here, the

11   Court has already found that there is a potential for coverage

12   should the alleged facts prove" -- I'm sorry -- "be proven true

13   particularly where again as here the policy provides that if it

14   does not apply" -- I'm sorry -- "that is later adjudicated that

15   it does not apply to the underlying allegations, the policy

16   specifically provides that the insurer would be reimbursed.

17   The insurer is obligated where there is a reasonable potential

18   for coverage to advance the defense costs."

19          The Court in Sometimes Media Group, Inc. v. Royal and

20   Sun Alliance Insurance Company of Canada, 2007 WL 1881 265, Del

21   Super June 20, 2007 makes a similar point.  "Furthermore, the

22   personal exclusions do not override a present contractual duty

23   to advance defense costs unless the defendants can

24   unequivocally now show that all of the obligations in the

25   underlying class action complaint fall within the personal

52

1   conduct exclusions.  Since the defendants have failed to show

2   at this time the applicability of exclusions to International,

3   the Court need not decide the potential applicability of

4   exclusions at this time."

5           Again, the Court noted that the policy provided as

6   paragraph (d)(2) does here "Such advance payments by the

7   insurer shall be repaid to the insurer to the extent that any

8   such insured shall not be entitled under the policy ultimately

9   to such payment."  And then it concluded, "Therefore, the plain

10  language of the policy guaranteeing an advancement of defense

11  costs is not precluded by an imputation of exclusions to

12  International as well as explained earlier to the outside

13  directors."

14          In light of that case law, I conclude that under the

15  language of the policy concluding its incorporation of the

16  extensive case law regarding how such policies are to be

17  interpreted in New York that pending a resolution of the

18  coverage dispute Axis is obligated to advance defense costs.

19  That is, in some instances an issue that the Court could and

20  does decide promptly here because of the substantial overlap

21  document it cannot be decided by me, but that is not a reason

22  for changing the rule that I have just articulated.  As is

23  again, I believe, supported by the Regius case from

24  Pennsylvania where the District Court was precluded by the

25  automatic stay in the Adelphia bankruptcy cacaos from deciding

53

1  a coverage issue and nevertheless concluded that the insurer

2  was obligated to advance the defense costs.  So for those

3  reasons, I will grant the insured's motions for summary

4  judgment.

5       Let me turn then to the cross motion for summary

6  judgment by Axis, which seeks a declaratory judgment that if,

7  in fact, it is subsequently determined by a court that the

8  defense costs are not covered, i.e., that an exclusion applies

9  or for some other reason they're not covered by the policy, the

10  insureds to have received the defense costs are obligated to

11  repay those costs to Axis.

12       Obviously, the contract provision that I quoted

13  earlier, paragraph (d)(2) says what it says.  And the fact that

14  it provides for repayment is an element of my reasoning as it

15  was in numerous other cases that I cited and quoted from.

16  However, I do not believe that Axis has set forth the basis

17  under the declaratory judgment act for a ruling on its motion

18  given that I believe there is no judicable controversy before

19  me, no insurer has refused to return any funds obviously

20  because there's yet to be any determination that such payments

21  were not covered or such losses were not covered under the

22  policy.

23       To my knowledge, no insurer has disclaimed that that

24  would be the appropriate result if such a determination

25  eventually is made and Axis has not pointed me to any such

54

1    disclaimer or other basis to sustain an argument that

2    notwithstanding a right controversy it has legitimate concern

3    that such contractual provision would be breached and,

4    therefore, would be entitled to a determination now.  So

5    consequently, I will deny that motion without prejudice on the

6    basis that, again, it does not set forth the basis on

7    declaratory judgment act for relief given the absence of a case

8    of controversy and a lack of any rightness.

9          There was no formal motion for an allocation of the

10   priority of the payments to be made by Axis.  I have, I

11   believe, dealt with this issue before in my prior rulings in

12   this matter.  I do not believe that request is properly before

13   me in the form of a motion or a properly raised controversy.

14   It may ultimately be one, but in the first instance I believe

15   that there has to be some dispute as to the allocation of

16   priority and that in the absence of such dispute the terms of

17   the contract will govern the party's conduct.

18         So the orders granting the summary judgment motions

19   should provide that the Court has not determined any issue with

20   respect to the priority of the advancement of defense costs and

21   that all parties' rights and indeed all nonparties' rights in

22   respect of priority allocations are fully preserved and

23   reserved.

24         As I normally do when I give a lengthy bench ruling,

25   particularly when I quote cases, I'll go over the transcript of

55

1   my ruling and reserve the right to amend it, both to correct it

2   and to add something if I believe it was -- it should properly

3   added, but my ruling won't change, which is that the summary

4   judgment motions are granted.

5          So I would ask each of the -- well, not each of you,

6   but the respective counsel for the groups of movants and

7   Mr. Murphy to submit orders for their respective clients

8   consistent with my ruling.

9          MS. KIM:  Your Honor, we believe our proposed order

10  is ready.

11         THE COURT:  I don't think I have it on a disk,

12  though.

13         MS. KIM:  I'll submit it, Your Honor.

14         THE COURT:  Okay.  You could email them to chambers.

15         MS. KIM:  Yeah, it says -- already says exactly that

16  same language.

17         THE COURT:  And you should cc: -- you don't need to

18  settle it on Axis, but you should cc: Ms. Gilbride when you

19  send it to chambers.

20         MS. KIM:  Oh, they are.

21         THE COURT:  So that she can make sure it's consistent

22  with my ruling.

23         MS. KIM:  Your Honor, may I raise one housekeeping

24  issue?

25         THE COURT:  Yes.

56

1          MS. KIM:  Mr. Klejna would like to make a motion for

2   summary judgment on coverage.  We believe we can do so without

3   going into the issue of anyone's knowledge because as the

4   Court -- as the Court previously recognized in retaining

5   jurisdiction on the counterclaim plaintiffs' complaint, we can

6   prevail as a matter of law, for example, on the knowledge

7   exclusion by demonstrating that as a matter of law the

8   exclusion is not a part of the policy, because it was

9   improperly added after the fact.  We believe we can show --

10          THE COURT:  But don't they have all the warranty --

11   don't they have the warranty issues as well?

12          MS. KIM:  Well, Your Honor, we can show that the

13   warranty is not a part of the policy as a matter of law also.

14   It's not a part of the allocation.

15          THE COURT:  What I'm going to ask you to do is put

16   this in a letter to me, cc'ing Ms. Gilbride.  It's not

17   something I can --

18          MS. KIM:  Oh, I was just going to ask --

19          THE COURT:  No, I'm not going to give you leave to go

20   forward on the summary judgment motion on just what you've told

21   me today.  I think you have to look at all of the exclusions

22   that Axis has raised and not just the knowledge exclusions and

23   I'm sorry, all of the defenses that Axis has raised and --

24          MS. KIM:  We understand, Your Honor.

25          THE COURT:  -- convince me that there's a reasonable

57

```
1  basis to go ahead on summary judgment notwithstanding the

2  substantial overlap.

3            MS. KIM:  Yes, sir.  I'll do so, Your Honor.  We

4  don't believe that all the insureds are necessarily in the same

5  position.

6            THE COURT:  No, you're just going to be speaking for

7  your particular client.

8            MS. KIM:  Understood.  Will do.  Thank you, Your

9  Honor.

10           MR. JEROME:  I assume, Your Honor, that she'll also

11 cc: the other insureds if different than --

12           THE COURT:  That's right.

13           MS. KIM:  All parties here.

14           THE COURT:  Okay.  All right.  Okay.  Anything

15 further?

16           ALL ATTORNEYS:  Thank you, Your Honor.

17           (Proceedings concluded at 12:11 p.m.)

18                      *  *  *  *  *  *

19

20

21

22

23

24

25
```

58

1

2                              * * * * * *

3            I certify that the foregoing is a court transcript

4   from an electronic sound recording of the proceedings in the

5   above-entitled matter, except where, as indicated, the Court

6   has modified the transcript.

7

8

9                        _____

10                                Ruth Ann Hager

11  Dated:  October 12, 2007

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

1