```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      ---------------------------------------X
                                               :
 4      In Re:                                 :    05-60006
                                               :
 5              REFCO, INC.,                    :    One Bowling Green
                                               :    New York, New York
 6              Debtors.                        :    September 11, 2007
        ---------------------------------------X
 7      TONE N. GRANT, et al,                   :    07-2005
                                               :
 8                    Plaintiffs,              :
                                               :
 9                    v.                        :
                                               :
10      AXIS REINSURANCE COMPANY,              :
                                               :
11                    Defendant.              :
        ---------------------------------------X
12                        TRANSCRIPT OF HEARING
13           BEFORE THE HONORABLE ROBERT D. DRAIN
                  UNITED STATES BANKRUPTCY JUDGE
14

15      APPEARANCES:

16      For Plaintiffs:       NORMAN L. EISEN, ESQ.
                              Zuckerman, Spaeder, LLP
17                            1800 M Street, N.W.
                              Washington, D.C.  20036
18
        For Messrs Grant:     HELEN B. KIM, ESQ.
19       and Klejna           Baker & Hostetler, LLP
                              333 South Grand Avenue
20                            Los Angeles, California  90071

21      For Mr. Trosten:      BARBARA MOSES, ESQ.
                              Morvillo, Abramowitz, Grand, Jason,
22                             Anello & Bohrer, P.C.
                              565 Fifth Avenue
23                            New York, New York  10017

24      For Axis:             JOAN M. GILBRIDE, ESQ.
                              Kaufman, Borgeest & Ryan, LLP
25                            99 Park Avenue
                              New York, New York  10016

                         (Appearances continued on next page)
```

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:


For Mr. Silverman:          RICHARD CASHMAN, ESQ.
                            Heller, Ehrman, LLP
                            Seven Times Square
                            New York, New York  10036

For Messrs. Sexton and:     IVAN O. KLINE, ESQ.
  Shearer                   Friedman, Wittenstein & Hochman
                            600 Lexington Avenue
                            New York, New York  10022

For RJM, LLC:               STEVEN WILOMOWSKY, ESQ.
                            Bingham, McCutchen, LLP
                            399 Park Avenue
                            New York, New York  10022

For Mr. Murphy:             JOHN J. JEROME, ESQ.
                            Saul Ewing, LLP
                            1500 Market Street
                            Philadelphia, Pennsylvania  19102



Court Transcriber:          CARLA NUTTER
                            TypeWrite Word Processing Service
                            356 Eltingville Boulevard
                            Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1          THE COURT:  _Grant v Axis Reinsurance_ in the _Refco_

2 case.

3          MR. EISEN:  Good morning, Your Honor.

4          Norman Eisen representing Mr. Grant and I will be

5 arguing on the motion for advancement on behalf of Mr. Grant,

6 Mr. Trosten and Mr. Bennett, although Mr. Trosten and Mr.

7 Bennett's counsel are here as well and they may wish to join in

8 at certain points.

9          THE COURT:  Okay.

10          MR. EISEN:  On behalf of everyone we want to thank

11 the Court for taking the motion on an expedited basis.  We

12 believe that the fundamental issues that are raised by our

13 advancement motion were raised and decided by the Court on the

14 other insurance motion that we were before the Court on less

15 than two weeks ago.  As the Court knows, the criminal

16 defendants -- we refer to them as the presumed innocent

17 defendants in distinction to Axis designation -- joined in the

18 motion for advancement we argued and the Court actually

19 addressed in the course of its holdings -- actually addressed

20 the prejudice to the criminal defendants with respect to the --

21 on the balancing of harms.

22          I will just quickly go through the issues and I think

23 reference to Axis' brief makes clear that fundamentally Axis is

24 rearguing the issues that were before the Court the last time

25 we were here on the question of what the standard is, whether

D R A F T                                                    4

1   this is a prohibitory or mandatory injunction.  The Court has

2   already invoked the reasoning of <u>Worldcom</u> and ruled.  The Court

3   has applied the test of a likelihood of success on the merits

4   or a sufficiently serious question and balance of harms.  There

5   is no new issue in the brief about and we recognize the Court

6   likely went to the sufficiently serious question and balancing

7   the harms prong of that test.  The Court noted as much when it

8   was ruling previously.  There is no new issue in the papers

9   about the likelihood of success on the merits or the

10  sufficiently serious question going to the merits.  It is a

11  reargument of the clause relating -- the disputed clause and

12  the Court has already ruled on that.

13          On the balance of the harms, we would submit that,

14  again, as noted by the Court the harms are even more severe

15  because the criminal defendants are facing trial; it's not

16  merely a question of a risk of financial loss, it is a liberty

17  interest and the most serious liberty interest and any

18  disruption in the preparation for trial as the Court noted is a

19  very, very serious harm indeed.

20          One of the only -- I will not rehash absolutely every

21  argument that the Court has head ad infinitum in the many, many

22  papers that have been filed.  I'll attempt to focus on what's

23  new in Axis' submission and the response.  They do rely on a

24  new case in addressing the balancing of the harms, that is the

25  <u>Gaone v. Twin Cities</u> case.  We obtained from Axis --

```
                          D R A F T                          5
```

1    THE COURT:  No one gave me a copy of that case.

2    MR. EISEN:  Your Honor, we had the same problem --

3    THE COURT:  And consequently I'm not going to

4  consider it.

5    MR. EISEN:  Okay.  Then, Your Honor, really the only

6  other significant --

7    THE COURT:  Let me -- it's an unpublished decision.

8    MR. EISEN:  Yes, it is, Your Honor.

9    THE COURT:  You're all familiar with the Second

10 Circuit rule on citing unpublished decisions.  If I were to

11 consider it as persuasive authority, simply like a _Law Review_

12 article or the like, I would have expected the parties to have

13 provided it to me since I prepare in advance for these things

14 and this is a preliminary injunction hearing and that's not

15 done and so I'm not going to consider it.

16    MR. EISEN:  Understood, Your Honor, and we certainly

17 are not relying on it and you won't hear anymore about it from

18 us.

19    The only other issue of significance that is new in

20 the papers is the priority of payments issue and that popped

21 up, really, yesterday with the filing of Axis' opposition and

22 then of the motion to intervene.  With respect to proposed

23 intervenors issues, we conferred with them before court this

24 morning and we've also informed Axis of this, the movants today

25 are satisfied to have the identical form of order that the

D R A F T                                              6

1   Court entered last time with the addition of the proposed

2   language that Mr. Klejna's counsel has requested which is to

3   the effect that nothing in this order shall effect the priority

4   of payments issue.  We really do not view the priority of

5   payments issue as procedurally appropriate for a decision

6   before the Court.  It has not been teed up.  It is not ripe.

7   We don't know if there is a disagreement yet.  We haven't had a

8   chance to evaluate it.  Obviously, there's been no factual

9   development, there's been no briefing.  It really is a last

10  ditch attempt to interpose an obstacle to the payment of the

11  fees that the movants today so desperately need in order to

12  avoid disruption of the criminal case.

13          So the issues really being the same we would submit

14  to the Court that it is a straightforward application of the

15  decision that the Court has already rendered and, indeed, was

16  prepared to render but for the Court's request that we file an

17  adversary proceeding of our own and a motion for preliminary

18  injunction which we've done.

19          THE COURT:  What is the -- and there was some

20  confusion about this last time -- billed amount of the defense

21  costs for the three defendants?

22          MR. EISEN:  Your Honor, Axis has provided that

23  information on Page 30 of their opposition and I'll go over

24  that and then I will relate an issue -- conversation that we

25  all had amongst ourselves in the hallway just updating that and

D R A F T                                              7

1   I know Axis' counsel will correct me if I err.

2           When we were before the Court the last time the total

3   amount was in the neighborhood of $2 million for Axis.  As of

4   Friday, the total amount at issue was in excess of $2.9

5   million.  We certainly do not -- I think it's our position and

6   the other insured's position that none of us begrudge the

7   payment of those sums to the other.  Indeed, for the criminal

8   defendants it is crucial because the pipeline is building up

9   and we have so much work to do and the consequences are so

10  great.  We would ask the Court to order payment of that amount.

11  Approximately $300,000.00 of that $2.9 million has already been

12  paid down or is in the process of being paid down.

13          THE COURT:  Well, let me make sure of that.  The

14  aggregate number you gave me, the $2 million as of last Friday

15  --

16          MR. EISEN:  It's $2.9 million, Your Honor, as of

17  Friday.

18          THE COURT:  I'm sorry.  Then there was $2 million as

19  of the hearing that we had.

20          MR. EISEN:  Yes, Your Honor.

21          THE COURT:  That includes the defense costs of which

22  defendants?

23          MR. EISEN:  I believe that includes the defense costs

24  of all of the parties who were before the Court on the previous

25  motions and --

D R A F T                                    8

1          THE COURT:  Well, let me make sure.  It does not

2    include Mr. Lee; right?

3          MR. EISEN:  I do not know if it includes or not.  I

4    can speak for the five insured individuals represented by

5    Baker, Hostetler and the other firms and I can speak for the

6    three criminal defendants.  I cannot at all speak for Weil,

7    Gotshal's clients, for Mr. Lee.  I'm sure Ms. Gilbride knows

8    the answer to that question.  I do not.

9          THE COURT:  All right.

10         MR. EISEN:  And just to update the Court there have

11   been approximately $1 million in additional invoices that have

12   come in over the weekend and yesterday.

13         MS. GILBRIDE:  I believe that is correct.  I actually

14   anticipated -- to correct you since we're on this topic, I

15   think the $2.9 million as of Friday does include the Thomas H.

16   Lee fees.

17         THE COURT:  It does.  Well, as far as the defendants

18   represented by Ms. Kim and Mr. Goodman, the ones represented by

19   Baker & Hostetler, I gather that that was about

20   $300,000.00/$307,000.00; is that right?

21         MS. GILBRIDE:  That's correct, Your Honor.

22         THE COURT:  And I'm taking that away for the record

23   in the district court?

24                    [Pause in proceedings.]

25         MS. GILBRIDE:  Oh, as of the earlier hearing, Your

```
                        D R A F T                        9
```

1   Honor.

2            THE COURT:  Right.

3            MS. GILBRIDE:  Not as of today.

4            THE COURT:  Right.  No, I understand.

5            MS. KIM:  Your Honor, the $307,000.00 was as of

6   August 30th for the five officer defendants that moved as of

7   that day.

8            THE COURT:  All right.  All five of them?

9            MS. KIM:  All five, not just the Baker, Hostetler --

10           THE COURT:  So that's not just Baker & Hostetler but

11  all five.

12           MS. GILBRIDE:  All five of the moving parties; right.

13           THE COURT:  All right.  Do we know how much is for

14  the movants today in the aggregate?  The three?

15           MR. EISEN:  Your Honor, I --

16           THE COURT:  Well, no, no, no, let me hear the answer.

17           MS. GILBRIDE:  Your Honor, my understanding is as of

18  yesterday for just these moving parties it's $2.9 million.

19           THE COURT:  Just them?

20           MS. GILBRIDE:  Just them.

21           THE COURT:  Just these three?

22           MS. GILBRIDE:  Yes, Your Honor.

23           MS. MOSES:  Your Honor, Barbara Moses, Your Honor,

24  for Robert Trosten.

25           THE COURT:  Well, let me make sure -- there's some

                         D R A F T                              10

1   conferring going on over here.

2                    [Pause in proceedings.]

3            THE COURT:  Just these three?

4            MS. GILBRIDE:  Yes, Your Honor.

5            THE COURT:  And how much as of the date that I

6   ordered the -- would you have this number as of the date that I

7   ordered the payment for the five represented --

8            MS. GILBRIDE:  Yes.  Yes, that would be $1.6.

9            THE COURT:  $1.6.

10           MS. MOSES:  These are the three numbers for us.

11           THE COURT:  Okay.  But that would be just for these

12  three --

13           MS. GILBRIDE:  Yes, Your Honor.

14           THE COURT:  -- as of the date of the earlier order

15  that I entered?

16           MS. GILBRIDE:  Correct.  As of August 31st; right.

17           THE COURT:  Okay.  Go ahead.

18           MS. MOSES:  I apologize, Your Honor.  I was

19  conferring with Mr. Eisen and I missed your last exchange with

20  Ms. Gilbride.  This is Barbara Moses speaking on behalf of

21  Robert Trosten.  But we, the three movants before the Court

22  this morning, have added up our numbers among ourselves and

23  they don't add up to $2 million.

24           THE COURT:  Well, okay.  I asked Ms. Gilbride two

25  questions; one was as of the most recent date and that was $2.9

D R A F T                                11

1   and I understood and then I asked as of August 31st which was

2   the date of my earlier order and that was $1.6 million.  Have

3   you broken it out that way too?

4           MS. MOSES:  Well, my understanding, Your Honor -- and

5   co-counsel for today's moving parties will correct me if I am

6   wrong -- but my understanding is that as of August 30th the

7   three plaintiffs who are before you today had submitted bills

8   totaling -- I'm doing this in my head so bear with me while I

9   round -- approximately $940,000.00 or maybe $950,000.00.

10          THE COURT:  Okay.

11          MS. GILBRIDE:  We received substantial bills just

12  yesterday from --

13          THE COURT:  No, we're just focusing right now --

14          MS. MOSES:  Right.  That was the August 30th figure.

15          MS. GILBRIDE:  Okay.  From Kramer, Levin.

16          THE COURT:  -- as of August 31st.

17          MR. EISEN:  Yes, that was included.

18          MS. GILBRIDE:  Okay.

19                  [Pause in proceedings.]

20          THE COURT:  So you include bills that cover the

21  period through August 30th in that $950,000.00 number?

22          MS. MOSES:  Your Honor, I'm going to apologize and

23  correct myself on the record.  Mr. Eisen tells me that my

24  figure was incorrect.

25          THE COURT:  Okay.  So is it as of August 31st it's

                    D R A F T                          12

1   really $1.6 million?

2           MR. EISEN:  It's $1.6 million to $1.7 million, Your

3   Honor.

4           THE COURT:  Okay.

5           MS. GILBRIDE:  That's the same number we have.

6           THE COURT:  Okay.

7           MR. EISEN:  Then just so I'm clear if I may ask Axis

8   through the Court it then goes up to $2.6 as of Friday when the

9   papers were filed according to Axis' motion at Page 30,

10  Paragraph 65, as of Friday, September 7th, Axis had defense

11  bills with a value of over $2.9, of this amount $307 was

12  subject to the Court's August 31st order so $2.9 minus $300 is

13  $2.6 and then as of the weekend and yesterday it is up to $2.9.

14          THE COURT:  Okay.

15          MS. GILBRIDE:  Yes,

16          THE COURT:  And what is that for?  September?

17          MR. EISEN:  No, Your Honor.

18          THE COURT:  Is that the difference is September?

19          MR. EISEN:  No.  With the Court's leave I will

20  explain the pipeline issue.

21          The firms have time going back to June that is in

22  these bills because of the way they're billed at the end of the

23  month.

24          THE COURT:  Okay.

25          MR. EISEN:  So you have June time, you have July time

D R A F T                                    13

1    and how you have August time coming in because August has

2    closed and the bills for August issue at the beginning of

3    September.  From the perspective of the criminal defendants --

4    and I don't believe that the other moving insureds who sought

5    advancement and whose motion we previously joined disagree.

6    What we would like to request the Court to do is to enter an

7    order that would be -- really, the words of which would be

8    identical to the order that was entered last time other than

9    the caption and the introductory paragraph which would provide

10   that the bills should be paid through the date of the order

11   subject to the proviso that nothing in the order effects the

12   priority of payments because, you know, none of us wants -- we

13   recognize as the Court noted previously that it is a narrow

14   ruling confined to the obligation to advance that does not get

15   into other issues.  I would only add that in terms of the

16   equities or the harms to have -- we are already going to be

17   carrying September time while we wait for the issue to be

18   resolved.  We are at the point of having to undertake as is

19   obvious from the bills very substantial work to get ready for

20   trial which is in March and I really think it goes to the

21   spirit and the letter of the cases to -- obviously, I'm not

22   asking the Court to issue an injunction that carries forward.

23   I recognize that there's going to be a motion for summary

24   judgment heard in October but in order to avoid disruption it's

25   important to have some lessening of the liabilities hanging

D R A F T                                      14

1   over the clients in the pipeline and the other movants agree

2   with that provided the language is inserted about the priority

3   of payments.

4           THE COURT:  Well, let me make sure I understand that.

5   I mean I can certainly see them making the argument that they

6   moved first for an injunction and I approved -- ordered the

7   payment of the defense costs through the date of the earlier

8   order so they're in essence now a week or so behind and that

9   may be a meaningful week because of month-end billing and so

10  you're saying they don't oppose your sort of jumping ahead by

11  that extra billing?

12          MR. EISEN:  Your Honor, I think they would ask that

13  that be reciprocal that it also apply to them so the -- and I

14  think that that is --

15          THE COURT:  Well, let me hear from.  They're standing

16  up behind you so --

17          MR. KLINE:  Your Honor, Ivan Kline from Friedman,

18  Wittenstein for two of the other movants, Mr. Sexton and Mr.

19  Shearer.  I know I'm speaking also for Mr. Silverman.  I

20  believe -- because we joined in the same comment with Baker &

21  Hostetler -- our position is that it should be limited to the

22  same date, August 31st or August 30th, whichever it was --

23          THE COURT:  The date of that order.

24          MR. KLINE:  And they should not be jumping ahead and

25  let's be realistic, a bill sent for August time on September

```
                      D R A F T                           15
```

1    8th is really not due now in any event and lawyers all the time

2    carry their bills for thirty days.  We didn't get payment from

3    U.S. Specialty or Lexington in, you know, a week after the

4    bills were submitted and in all fairness, understanding the

5    situation they're in is really -- we could all wait until

6    October 12th for the bills that are being sent out in

7    September.  That is our position and that this order should not

8    go beyond the same August 31st cutoff under any circumstances.

9            THE COURT:  All right.  Ms. Kim, is that the view for

10   your clients as well?

11           MS. KIM:  Yes, Your Honor.  However, if you are

12   inclined to grant that as of this date --

13           THE COURT:  No, I understand.

14           MS. KIM:  Then, of course, we'd want to be brought to

15   the same and not falling behind, Your Honor.  That's all.

16           THE COURT:  Right.  Okay.  All right.

17           MR. EISEN:  Your Honor, our view is -- and I

18   apologize, I had understood from my conversation from Ms. Kim

19   that she was comfortable, in fact I circulated a form of order

20   that provided today and I had understood that others were

21   comfortable with that form of order and --

22           THE COURT:  Well, as long as they were going to get

23   pushed up but I phrased my question with the assumption that

24   they weren't --

25           MR. EISEN:  I apologize if I did not understand the

D R A F T                                          16

1   admittedly rushed conversation in the hallway.

2          Your Honor, the criminal defendants, though, would

3   submit to the Court that there are different exigencies that

4   apply to our need and if I may the clients will be facing the

5   prospect of uncertainty as you've heard from Axis very

6   substantial August bills on top of very substantial September

7   bills.  It's not just the question of Axis having agreed to pay

8   and waiting a reasonable amount of time for the invoice to be

9   honored, it is th uncertainty and the precise chilling effect

10  on the ability to defend the case that the Worldcom Court was

11  concerned with when it balanced the harms.  I do think in

12  fairness that if the Court were to order this relief that it

13  ought to apply to the intervening parties as well but the

14  criminal defendants are really in a unique situation because of

15  the pendency of the criminal case and it will have a disruptive

16  effect on the ability to defend that case.  They will be

17  incurring enormous costs and so I would ask the Court in a

18  balanced way that also recognized the needs of the intervenors

19  and for that matter of Axis with respect to priority of

20  payments to enter the order that allows us to limit some of the

21  back log.  We're not insisting that those bills be paid

22  tomorrow.  Axis can take a reasonable amount of time to

23  evaluate them.  I understand that there were some deductions

24  that they applied to the bills that the others who were before

25  the Court a little less than two weeks ago submitted and we

D R A F T                                        17

1   don't have any objection to the normal course.  What is

2   difficult for us is to arrive at mid-October carrying millions

3   of dollars in fees for August and for September not knowing

4   whether our clients are going to be able to defend the criminal

5   case.  We think that the case law provides guidance to the

6   Court that in those circumstances it is appropriate to award

7   those fees and, frankly, the context is not irrelevant.  We

8   believe that Axis -- well, I certainly won't rehash the

9   argument -- we think that Axis should have advanced these fees.

10  The first two layers of insurance did advance the fees, we've

11  been in this position of jeopardy for some time and, you know,

12  Axis could have avoided today by, once the Court made its view

13  of the law and the facts clear, agreeing to advance fees we

14  would not be here.  So to some extent Axis has proceeded at its

15  peril.  We think that that raises issues about the good faith

16  of the insurer but that at any rate it is fair and right and

17  equitable for the criminal defendants to have the pipeline

18  lessened somewhat.

19          THE COURT:  Do you or the other two movants have any

20  factual showing that you want to make in respect of the issue

21  of whether in no particular order if I ruled or whatever Court

22  had jurisdiction over this matter ruled against them ultimately

23  that they could reimburse the money advanced?  That would be

24  one issue.  The other issue is their ability to pay currently

25  themselves and, I guess, the third issue is as to the defense

D R A F T                                      18

1   counsel's willingness to proceed with this issue hanging over

2   them or do you intend to rely on the logic that Judge Cote set

3   forth in <u>Worldcom</u>?

4              MR. EISEN:  Your Honor, I'll take those --

5              THE COURT:  In no particular order.

6              MR. EISEN:  -- in no particular order.  I think there

7   are two guiding precedents; one is the <u>Worldcom</u> case on your

8   first question and the other is this Court's decision two weeks

9   ago and this is the exact argument that the insurers made in

10  <u>Worldcom</u>.  I'll just read from the opinion at 469 to 470,

11  "Continental and Twin City argue that Roberts has failed to

12  show irreparable injury because he has not shown that he is

13  unable to retain counsel from his own funds" and then later on

14  the <u>Worldcom</u> Court also addresses the argument about

15  reimbursement and the Court says, the issues here surmount

16  whether an individual director has or does not have sufficient

17  funds to pay counsel when confronted with litigation stemming

18  from services of a corporate director.  In some cases it will

19  be minor, here it is massive, in some cases a director will

20  have great personal wealth, in other cases she will not.  The

21  issue here is whether every director is protected by a policy

22  to have the ongoing payment of defense costs.  So we think that

23  <u>Worldcom</u> -- that that's the wrong question under <u>Worldcom</u>.

24  This is a -- as the Court noted at 87 to 88 of the transcript,

25  this is a massive litigation.  As demonstrated the Court has

D R A F T                                          19

1   the evidence about the size of the bills, it has the evidence

2   about the pending civil cases that it relied on when we were

3   last before the Court.  It certainly is aware of the pending

4   criminal cases and, respectfully, Your Honor, we think that the

5   case law does not require that question to be answered and for

6   the same reason that the Court advanced previously it's

7   appropriate to do so as of today or if the Court -- really, as

8   of today as to all the insureds.  We're not asking for special

9   treatment.  It really is to all the insureds and we wouldn't be

10  here but for Axis' refusal to do that.  Indeed, for their

11  refusal to do something less.

12          THE COURT:  Okay.  What about the other two

13  defendants on that particular question?

14          MS. MOSES:  Thank you, Your Honor.  Barbara Moses for

15  Mr. Trosten.

16          I concur in Mr. Eisen's remarks.  I would also point

17  out that by asking the question together, by coupling the two

18  questions of ability to pay defense costs currently and ability

19  to repay in the event the case ultimately is determined

20  differently, I think Your Honor may have fallen into, perhaps

21  just on a testing the waters basis, what's really a Catch-22

22  that the carrier would like to set up.  On the one hand, they

23  have urged Your Honor and Your Honor rejected this on August

24  30th, correctly we believe, on the one hand they urged Your

25  Honor to require the insureds to prove that they are broke in

D R A F T                                           20

1    order to get the advancement to which they are contractually

2    entitled but then in the next breath they have urged Your Honor

3    to rule that if the insureds are broke relief should be denied

4    because they will be at risk of non-repayment should the case

5    turn out adversely later in the day.  It seems to me, Your

6    Honor, that common sense and ordinary principles of equity tell

7    you that they can't have it both ways.  With respect to the

8    ability to repay, let me make the following, I think, also

9    common sense comment which is that the ability of an insured

10   who is facing criminal charges and is subject to a pre-trial

11   asset freeze order to repay at the conclusion of the criminal

12   trial depends in large part on how that trial comes out.  Now,

13   Axis, I think, would like for my client and the other criminal

14   defendants to lose their criminal trial because they will then

15   use that in the coverage dispute but with respect to the

16   ability to repay I say to you that we need the defense costs

17   now in order to insure that the criminal trial comes out in

18   favor of our clients which in turn has a bearing on the ability

19   to repay at the end of the day.

20           THE COURT:  Okay.

21           MR. GOLENBOCK:  Your Honor, Jeffrey Golenbock for Mr.

22   Bennett.

23           I would like to rely on the arguments that have been

24   made by my colleagues.  I don't think I need to add anything

25   further.  I'll, of course, answer any questions Your Honor may

```
                    D R A F T                              21
```

1   have.

2            THE COURT:  Okay.  Thank you.

3            Ms. Gilbride.

4            MS. GILBRIDE:  Your Honor, the first thing I'd just

5   like to note for the record is that we have gone ahead as

6   suggested by Your Honor during the August 30th hearing and made

7   a motion to withdraw the reference.  I think it is important

8   for the Court to be aware of that.  Perhaps you are already

9   aware of that.

10           THE COURT:  I was.  Yes.

11           MS. GILBRIDE:  Okay.  That motion is before the

12  district court.  We're not quite sure where we are procedurally

13  with that so I can't report back where we are and when there's

14  going to be a hearing.  We have certainly asked that there be a

15  hearing expeditiously.  I believe that there will be but we

16  face substantial opposition from the insureds with respect to

17  going that route as suggested by Your Honor on August 30th.

18           In any event, I don't believe we're here today in the

19  same posture that we were here on August 30th.  First of all,

20  the three moving parties here today initially moved to dismiss

21  Axis' complaint.  They joined in that motion.  That motion was

22  granted by Your Honor.  They have now turned around and

23  instituted an adversary proceeding seeking the same relief

24  sought by other moving parties and, Your Honor, I would suggest

25  that that is just fundamentally unfair and an abuse of the

D R A F T                                22

1   legal system by these moving parties.

2          Additionally, Your Honor, these three defendants are

3   not in the same posture on any test, particularly, one of the

4   three moving parties as the moving parties on August 30th who

5   requested the preliminary injunction.  One of these parties is

6   the individual who signed the warranty letter that Axis relied

7   upon.  He's the individual who signed the application, he's the

8   individual whom the company disclosed in an SEC filing three

9   days after -- excuse me, shortly after the company went public

10  that he had hidden $430 million worth of receivables.  Well,

11  that was information that Axis relied upon as well.  So, Your

12  Honor, I submit we are not in the same position that we were in

13  on August 30th.

14         With respect to the preliminary injunction, Your

15  Honor, I apologize first of all that we did not attach the

16  Gaone transcript.  It's not a published decision.  It's a

17  transcript.  It was before Your Honor on August 30th.  It was

18  submitted by Arch, who sought to intervene on that day.  In any

19  event, we'd be happy to hand up a copy to Your Honor but you've

20  already made it clear that you're not going to rule upon it.

21  This preliminary injunction was brought on very quickly as Your

22  Honor is aware and we apologize, again, for not submitting that

23  but I would strongly urge that the Court consider the

24  propositions that were articulated in that ruling which

25  essentially our position is that what Judge Wood did was simply

D R A F T                                      23

1   apply Second Circuit case law which is clear that if you're

2   going to apply the lower standard for injunction there has to

3   be a balancing of harms.  There's been no factual record made

4   before this Court; not one affidavit, not one individual has

5   come here to testify before Your Honor with respect to the

6   irreparable harm that they have allegedly suffered.  There is

7   no factual record before Your Honor and I submit under Second

8   Circuit law that is simply fatal to an application for a

9   preliminary injunction.

10          Going to the balancing of harms, Your Honor, you

11  know, on the one hand you have individuals who have made no

12  factual showing whatsoever but who have come before Your Honor

13  and said that their defense is going to be devastated because

14  their defense counsel is not paid.  Well, I submit that that

15  should have been submitted to Your Honor in factual form.

16  There should have been evidence submitted to your Court of that

17  not counsels' statements.  But in any event, so there's no

18  factual showing.

19          On the other side of the coin you have an insurance

20  company who has a policy provision that says if we are

21  ultimately successful we are entitled to repayment.  The

22  movants are here on a preliminary injunction.  Rule 65 provides

23  the answer to all of these questions.  If the Court is inclined

24  to grant the preliminary injunction, Your Honor, we would

25  suggest that the Court require the moving parties to post a

D R A F T                                            24

1  bond or some form of security so that in the event some court

2  agrees with Axis' position and finds that we have been

3  wrongfully enjoined that there is then some security for Axis

4  with respect to repayment.  Otherwise, Your Honor is advancing

5  something -- advancing relief to these parties on a very

6  preliminary basis without a full-blown hearing, with Axis'

7  complaint having been dismissed.  So with Axis not having the

8  ability to present its arguments in any shape or form and not

9  even requiring a factual showing by the parties and, you know,

10  Your Honor, we would submit under those circumstances at the

11  very least that the Court order these moving parties to post

12  some form of security in the event that Axis is successful.

13          You know, under the circumstances it's clear that

14  Axis has zero prospect of being repaid if at the end of the day

15  Axis is actually successful in whatever form we are able to

16  actually litigate our dispute.

17          With respect -- I don't know if you want to get into

18  the priority of payments issue, Your Honor, the issue we have

19  there is that separate and apart from defense costs there has

20  been an executed MOU submitted to Axis and as of today if some

21  court ultimately finds that there is actually coverage under

22  the policy and we are required to fund that settlement -- if

23  the Court says we should have considered that settlement as of

24  the date the settlement was executed, Your Honor will be

25  ordering us to advance defense costs in excess of our policy

D R A F T                              25

1   limits.  Now, we are not at liberty to share that MOU with you

2   but --

3           THE COURT:  But you aren't paying under the MOU;

4   right?  Your clients aren't making a payment.  It's disputing

5   the coverage, I think.

6           MS. GILBRIDE:  Well, we've been asked to fund the

7   settlement.

8           THE COURT:  I know but you're not paying it.

9           MS. GILBRIDE:  I don't know that any determination

10  has been made.  Whether we are going to fund it or not has not

11  come to fruition.

12          THE COURT:  But I thought that Axis disclaimed

13  coverage?

14          MS. GILBRIDE:  Well, we did, Your Honor, but you

15  know, there's a moving target in terms of what the Court is

16  ordering us to do here.

17          THE COURT:  Well, but all I'm saying is the

18  individual -- I'm assuming it's an individual -- who submitted

19  the proposed settlement hasn't sought relief to compel payment;

20  right?

21          MS. GILBRIDE:  Not yet.

22          THE COURT:  Okay.  So how does requiring payment of

23  the defense costs to somebody who hasn't sought that relief and

24  I'm assuming that anyone whose the beneficiary of their policy

25  knows that if this litigation is going on and would make the

```
                    D R A F T                        26
```

1  same application that if they really wanted to enforce it but

2  hasn't.  How does my ordering the -- if I were to do it -- the

3  advancement of the defense costs put the insurer at a

4  disadvantage?

5           MS. GILBRIDE:  Your Honor, historically, the defense

6  costs have been reimbursed by the two underlying carriers on a

7  first in/first out basis.  So if one was to consider the

8  settlement as of the date it was executed in that line of

9  payments and we do ultimately -- we are required to fund the

10  settlement -- by advancing these defense costs now we could

11  theoretically or we would be asked -- we are being put in a

12  position where we potentially are paying fees --

13           THE COURT:  Well, when was the MOU submitted?

14           MS. GILBRIDE:  When was it executed?  August 30th.

15           THE COURT:  Well, what --

16           MS. GILBRIDE:  Well, it was signed on August 30th.

17           THE COURT:  But when was it submitted to the insurer?

18           MS. GILBRIDE:  July 30th.

19           MR. EISEN:  No.

20           MS. KIM:  Yes, July 30th.

21           MR. EISEN:  The MOU submitted --

22           THE COURT:  But it was signed after it was submitted?

23           MS. KIM:  Your Honor, may I address that issue?

24           THE COURT:  Okay.

25           MS. KIM:  Helen Kim on behalf of Mr. Klejna, Your

D R A F T                                27

1  Honor.  The MOU which was a settlement demand from the lead

2  plaintiffs in the underlying securities litigation in <u>In Re:</u>

3  <u>Refco</u> securities litigation was submitted to Axis on July 30th

4  on the date it was received by Mr. Klejna.

5         THE COURT:  Okay.

6         MS. KIM:  With a request to Axis to assist in the

7  settlement and to --

8         THE COURT:  To assist but as far as a settlement

9  itself, when was that submitted as a settlement?

10        MS. KIM:  Well, we requested Axis to join the

11  negotiations because they have an obligation under the policy

12  to consent to settlement.

13        THE COURT:  All right.  But as far as an obligation

14  to pay money in respect of a settlement --

15        MS. KIM:  Well, Your Honor, it is our position that

16  Axis has an obligation, once it's presented with a signed

17  settlement agreement, to either consent or not consent and so

18  it has to set aside money for a settlement if it consents.

19        THE COURT:  I'm sorry, it wasn't signed when it was

20  submitted to them in July; right?

21        MS. KIM:  Not on July 30th but after --

22        THE COURT:  It was signed at the end of August;

23  right?

24        MS. KIM:  It was signed on August 30th after Axis

25  gave us -- told us to proceed as a prudent uninsured and to

D R A F T                            28

1  proceed accordingly.

2          THE COURT:  Okay.  So wouldn't that be the relevant

3  date then?

4          MS. KIM:  August 30th; correct, Your Honor.

5          THE COURT:  Okay.

6          MS. KIM:  So what we're saying is -- and this goes to

7  the issue of priority of payments -- as long as any order on

8  the preliminary injunction does not interfere with the priority

9  of payments under the terms of the Axis policy we don't believe

10 that there's a problem.

11         THE COURT:  Okay.  How would it interfere?  Say I

12 were to require payment of these three individual defense costs

13 as of the date of my order which, I forget, was that either

14 August 30th or 31st?

15         MS. GILBRIDE:  The 31st.

16         THE COURT:  How would it interfere with this separate

17 potential obligation?

18         MS. KIM:  It would not, Your Honor.

19         THE COURT:  Well, no, I was asking Ms. Gilbride.

20         MS. KIM:  Oh, I'm sorry.

21         MS. GILBRIDE:  If you were to order today as of

22 August 31st?

23         THE COURT:  Yes.

24         MS. GILBRIDE:  We're just trying to look at the

25 numbers and figure this out.  We were anticipating that Your

```
                    D R A F T                        29
```

1   Honor might be inclined to award advancement of defense costs

2   as of today.

3            THE COURT:  No, well, that wasn't my question.

4            MS. GILBRIDE:  Okay.  I know.  So I don't have the

5   answer readily available.  I apologize.

6            MS. KIM:  If it's $2.1 million as of August 31st

7   which were the numbers that we discussed earlier there would be

8   nothing, Your Honor.  No interference whatsoever.

9            THE COURT:  All right.

10           MS. GILBRIDE:  Your Honor, I think that if it was as

11  of August 31st I agree that we would still be within the policy

12  limits.

13           THE COURT:  All right.  I'm not saying that that's

14  where I'm going on this.  I'm not saying that's -- no one

15  should read this as a determination of any allocation or

16  priority issues.

17           MS. KIM:  We understand, Your Honor.

18           THE COURT:  It's just that we're trying to figure out

19  the facts.

20           MS. KIM:  That's right, Your Honor, and we agree with

21  Your Honor.

22           MR. EISEN:  Your Honor, were the Court to decide to

23  enter the identical order as last time effective as of today,

24  the date of the order, it could also address this issue by

25  simply including the sentence that Ms. Kim requested.  We and

D R A F T                                    30

1  Ms. Kim's clients agree on that that this order does not effect

2  the priority of payments in any way.

3          THE COURT:  Well, I know that an order can say that

4  but as a practical matter it might wouldn't it?

5          MR. EISEN:  No, Your Honor, we think it would not

6  because the insurer is perfectly capable, as they've

7  demonstrated, of taking positions on the legal issues.  The

8  priority of payment issue is, we think, a Mankwait issue.  The

9  settlement has not been presented much less approved.  They

10  could certainly pay up to the limits without any risk.

11         THE COURT:  Well, no, let me -- as I understand Axis'

12  point, it's this, that although they have disclaimed coverage

13  ultimately they might have to pay on the settlement and since

14  the settlement came in as of a date that preceded some of these

15  bills, you know, the ones in September they would be paying

16  these bills -- the post-September bills -- potentially out of

17  sequence, first come/first serve.  Now, maybe that's not right,

18  maybe that priority doesn't depend on first come/first serve

19  necessarily but that's their point.

20         MR. EISEN:  Your Honor --

21         THE COURT:  And they wouldn't have any ability

22  necessarily to get it back or reallocate it necessarily.

23         MR. EISEN:  Your Honor, the issue is clouded because

24  the amount of the settlement is unknown.  However, I can

25  represent to the Court based on conversations with various

D R A F T                                    31

1   persons attempting to determine, you know, would you pay the

2   bills as of the beginning of September, mid-September, so on

3   and so forth, that the -- we believe it would be possible to

4   without implicating the priority of payments issue at all to

5   pay the bills through Friday but, again, there is a safe harbor

6   for this which is simply to provide in the order to have us

7   agree that pending the resolution in October the insurer only

8   needs to pay up to the amount of the settlement.  If, for

9   example, the settlement is $6.5 million --

10          THE COURT:  No, I understand your point.  All right.

11  So that would be a cap --

12          MR. EISEN:  That is a way to accommodate the harms

13  that the criminal defendants are facing and at the same time

14  give Axis a safe harbor.

15          THE COURT:  Okay.

16          MS. MOSES:  May I add a word, Your Honor, on the

17  priority of payment issue?  A word which is, I think,

18  particularly appropriate given Ms. Gilbride's comments

19  concerning consistency in litigation position.

20          We were required to initiate a new adversary

21  proceeding and to submit a pleading -- an adversary complaint -

22  - demanding payment of our defense costs in an ongoing schedule

23  in order to properly put this issue before Your Honor and be in

24  a position to ask Your Honor for a preliminary injunction for

25  that relief.  The settlement issue has never been teed up in

D R A F T                                    32

1  any pleading.  So, clearly, whether the Court has if you will

2  jurisdiction to rule on it at this point --

3          THE COURT:  Well, I don't think they're asking me to

4  rule on it, I think they're saying that as far as the balance

5  of the harms go is I should take it into account.

6          MS. MOSES:  Well, second, Your Honor, Ms. Gilbride

7  has also asked Your Honor where's the evidence and has in

8  effect asked Your Honor to ask us for evidence of financial

9  condition but, again, there has been no evidence presented to

10  Your Honor of the settlement or its amount or any of its

11  particulars and, third, Your Honor, as we all know we have not

12  had an opportunity to brief this point but as we all know from

13  having practiced in federal court and under Rule 23 any

14  settlement in In Re:  Refco would have to be approved both

15  preliminarily and finally after a notice and comment period by

16  Judge Lynch before it would be binding on anyone.

17          THE COURT:  Okay.

18          MR. EISEN:  Your Honor, in addition to the very last

19  point that Ms. Gilbride made, I do think that we and Ms. Kim's

20  client and the other insureds agree that that language that she

21  suggested to the order that this does not effect the priority

22  of payments would allow the insurer to pay up to what's

23  available and then provide a safe harbor for the test.

24          May I very quickly be heard on Ms. Gilbride's other

25  points?

                        D R A F T                           33

 1          THE COURT:  Well, I hadn't finished asking her

 2  questions.

 3          MR. EISEN:  Okay.  I'll sit down.

 4          THE COURT:  You can be briefly but after I -- I want

 5  to go back over something that we spent a lot of time on the

 6  last hearing, the interpretation of the provision of the U.S.

 7  Specialty policy that says the insurer will pay covered defense

 8  costs on an as incurred basis and as I understand it Axis'

 9  argument is that these defense costs aren't "covered" under the

10  policy?

11          MS. GILBRIDE:  Yes, Your Honor.

12          THE COURT:  But is that based simply on the

13  exclusions?

14          MS. GILBRIDE:  Yes.  It's based upon the warranty and

15  --

16          THE COURT:  Well, the warranty is not part of the

17  policy is it?

18          MS. GILBRIDE:  Well, it becomes part of the policy

19  and it provides for its own remedy, Your Honor.  It becomes an

20  exclusion by its own terms.  At the bottom of the warranty it

21  provides that it becomes part of the policy and becomes an

22  exclusion and it does not require any filing of adjudication of

23  facts, it simply requires that Axis in good faith make a

24  determination whether it applies to the facts before it and

25  determine whether or not there's coverage.

                    D R A F T                              34

1          THE COURT:  Well, now you're moving away from the

2    warranty, too, the overall argument?

3          MS. GILBRIDE:  No, I was just saying what the remedy

4    is that the warranty provides.

5          THE COURT:  Okay.  All right.

6          Then I guess my other question on this same contract

7    issue is you point to the following paragraph, Paragraph 3,

8    which is dealing with the allocation of losses covered and

9    losses not covered and say that that's further indication that

10   the insurance carrier was given the authority under this

11   contract to act unilaterally if it wasn't able to agree and my

12   question is, I guess, why go through that distinction at all in

13   three if coverage pertains already?  Why isn't that just a

14   separate provision dealing with allocation?  I mean if -- as I

15   take it your first argument is you can act unilaterally as to

16   whether something is covered or not.  Why would the parties

17   then have a whole separate provision that would say the same

18   thing?

19         MS. GILBRIDE:  Your Honor, we pointed to condition

20   (d)(3) simply as evidence that the entire policy should be

21   construed in context.  So our position is not that you should

22   go to (d)(3) with respect to this dispute, we rely solely with

23   respect to this dispute on (d)(1) but we rely upon (d)(3) as

24   evidence to be in support of our position under (d)(2), (d)(3)

25   is a provision that you actually utilize when there's covered

D R A F T                                    35

1   and uncovered claims.   So Your Honor is absolutely right that

2   you would not utilize (d)(3) in this dispute.   We were simply

3   pointing it out to show that it is consistent with Axis'

4   interpretation of (d)(2).   Our position is that (d)(2) says in

5   the first instance if defense costs are not covered if the

6   policy is not triggered then Axis, acting in good faith, of

7   course, would not have to advance defense costs.

8          THE COURT:   Okay.   Thanks.

9          MR. EISEN:   Your Honor, I'll take them in order and I

10  will attempt to be brief.

11         Ms. Gilbride's first point was that after joining in

12  the motion to dismiss for us now to seek advancement is an

13  abuse.   As the Court well remembers, we did not just join in

14  the motion to dismiss, in the alternative we also joined in the

15  motion to advance and in response the Court asked us to take

16  procedural steps.   We've done that.   We've been crystal clear

17  throughout that we believe there's a legal obligation to

18  advance so I think there's no inconsistency there.

19         In terms of the factual record issue, I really would

20  point the -- she first makes the point about irreparable harm

21  and then about the balance of the harms.   Our factual showing

22  is exactly the same factual showing that the other moving

23  insureds made.   It's exactly the same factual showing on both

24  of those points as was approved in Worldcom so I think that

25  this is an argument that was made and that was rejected and

D R A F T                                    36

1   that does not --

2          THE COURT:  Well, I guess the only distinction there

3   is there seemed to be agreement between the parties last week

4   that the five Ds and Os that were covered by the injunction

5   last week were fairly well-healed and I mean that was a point

6   that Axis made and no one really disputed it and that doesn't

7   go to the point of irreparable harm but it does go to their

8   other point about ability to reimburse and I understand your

9   colleague's point about the Catch-22 or a Hobson's Choice but I

10  think that may be a distinction between last week's record and

11  today's.

12         MR. EISEN:  Your Honor, I do think it is clear in the

13  Worldcom case that given the volume of the defense costs here -

14  - for example, as the Court knows in the KPMG criminal

15  litigation there was recently fact-finding by the district

16  court about what it costs to defend these cases.  Given the

17  volume the precise -- you know, it is a harm on anyone and that

18  that factual showing is not required, we think, under the case

19  law.

20         I would also -- it goes to, I guess, Ms. Gilbride's

21  repeated statements both here today and in the brief that

22  there's zero prospect of repayment.  That really turns the

23  presumption of innocence on its head.  We believe the clients

24  will be acquitted.  We're looking to the Court for the interim

25  time so that we can keep working in September and at the

D R A F T                                    37

1  beginning of October towards that goal and to presume that --

2  and Ms. Gilbride's conclusion really turns the legal

3  presumption on its head -- we think that she's made the wrong

4  analysis and she has not shown that there is zero prospect of

5  repayment and, of course, I think zero prospect is an

6  overstatement.

7           On the priority of payments issue we've already made

8  the point that there is a solution which is to include the

9  language and then the interpretation issues, we think, have

10 already been decided by the Court and those are queued up for

11 summary judgment so I won't speak to those now unless the Court

12 wishes me to.

13          THE COURT:  Okay.  Anyone else?

14          MR. CASHMAN:  Your Honor, may I be heard for one

15 moment?

16          THE COURT:  Yes.  Sure.  I'm sorry, which one of

17 these movants do you represent?

18          MR. CASHMAN:  I represent defendant Philip Silverman.

19 He was among those who received the benefit of Your Honor's

20 preliminary injunction last week.

21          THE COURT:  Okay.

22          MR. CASHMAN:  I just wanted to underscore, Your

23 Honor, that I do not believe the issue of priority of payments

24 is appropriately before Your Honor this morning.  I think I

25 would be remiss being here today, having listened to all these

D R A F T                                    38

 1  arguments, if I did not simply point out to Your Honor that

 2  there are various conflicting interests among the insureds that

 3  would have to be assessed in connection with any priority of

 4  payment argument that were made and so I think the only issue

 5  that ought to be addressed here today is simply whether or not

 6  defense costs should continue to be advanced at the request of

 7  the moving defendants here and through what date, I think.

 8  Those are the only issues that need to be addressed and ought

 9  to be addressed because all the other issues are complicated

10  and raise varying issues that are not before you today and the

11  policy itself does not offer a simple solution to those issues.

12          THE COURT:  Okay.  Well, let me hear somebody who

13  hasn't spoken yet.

14          MR. WILOMOWSKY:  Good morning, Your Honor.  Steven

15  Wilomowsky of Bingham, McCutchen, LLP on behalf of RJM, LLC,

16  the plan administrator.

17          Your Honor, I just want to make a point on the record

18  with regard to this motion because the tie-in that brings these

19  parties to this Court is the lift stay aspect, is obviously the

20  Refco aspect, but it does not follow necessarily that if the

21  Court's analysis that led to the lifting of the automatic stay

22  to the extent applicable for the other defendants necessarily

23  applies to the movants that are here today and the reason is,

24  Your Honor, the movants today, particularly Mr. Bennett and Mr.

25  Trosten, have not filed proof of claim against the estates.

```
                        D R A F T                              39
```

1  Mr. Grant, also, he did file a proof of claim.  His claim has

2  been estimated at zero dollars for all purposes including

3  distribution.

4         To the extent that in considering today's motion Your

5  Honor, taking into account impact on the estate, I think that

6  there is a difference between just, for example, Mr. Klejna,

7  who does have a claim filed against the estate and then,

8  presumably, even though that hasn't been litigated or allowed

9  or disallowed yet but at least it's a claim that's there that

10  potentially that any recoveries that they are able to get out

11  of Axis or any other insurer is going to serve to reduce the

12  claim against the Debtor's estates, whereas, with respect to

13  the recoveries, for example, that may be achieved by Mr.

14  Bennett, the only thing that's doing is really reducing

15  availability of insurance proceeds for other people who do have

16  claims and whose claims would be reduced if they were able to

17  receive insurance proceeds.

18         So we haven't taken a position in this litigation,

19  it's been until now, certainly, it hasn't been -- early on in

20  the cases there had been some involvement, we had been involved

21  with Lexington and it's been a close call among the plan

22  administrators whether to -- this whole process is an expensive

23  one and it's been a very time-consuming litigation for the

24  parties here and so we've been reluctant to get involved since,

25  ultimately, there are no dollars -- there are no actually

D R A F T                                    40

1  dollars that can come out of this policy that can come back

2  into the estates but we did want to say that to the extent that

3  Your Honor is reviewing today's motion both in terms of its own

4  jurisdiction and in terms of the lift stay standards and

5  elements, we would note that the estate is not going to be

6  benefitted to the extent that, for example, Mr. Bennett were to

7  recover from these proceeds.

8         THE COURT:  Whether you take Judge Berra's version of

9  it or Judge Gerber's version of it doesn't <u>Adelphia</u> control

10 here?  I mean there's been -- at this point they're simply

11 indicted, they're not convicted and under the <u>Adelphia</u> case law

12 which I think is the most thorough discussion of this issue,

13 wouldn't they be entitled to the money?  Leaving aside issues

14 of allocation which, again, I don't think I'm going to get into

15 but assuming that there are no allegation issues, don't they

16 come first?

17        MR. WILOMOWSKY:  Well, two responses to that.  First,

18 to the extent -- if one supposes that the automatic stay is

19 applicable here and I understand that that could be an open

20 question --

21        THE COURT:  Well, I don't think there's -- people

22 should stop talking about the automatic stay.

23        MR. WILOMOWSKY:  Okay.

24        THE COURT:  It's a plan injunction.

25        MR. WILOMOWSKY:  Okay.

```
                    D R A F T                        41
```

1    THE COURT:  The confirmation order is really clear on

2  this in Paragraph 34.

3    MR. WILOMOWSKY:  Okay.  That's correct, Your Honor.

4    THE COURT:  So when people are saying "automatic

5  stay" I'm translating it in my head --

6    MR. WILOMOWSKY:  They mean --

7    THE COURT:  -- the plan injunction.

8    MR. WILOMOWSKY:  Okay.  You got it, Your Honor.

9    THE COURT:  So that's what we're talking about.

10    MR. WILOMOWSKY:  All right.  In response to your

11  question I think that the differences here is that at least

12  what Adelphia speaks to is the access that the parties can have

13  to the policy notwithstanding the fact that they may be under

14  criminal indictment or whatever their situation might be.  I

15  think it's a separate question as to -- and I may be

16  misremembering Adelphia but I don't think that there was a

17  question in terms of the claims or at least the jurisdictional

18  question, I guess, which is if there is no possible benefit to

19  the estate then should this be something -- should this Court

20  be enjoining -- should be requiring this particular result from

21  Axis when either way there isn't going to be any possibility of

22  a benefit to the estate even in the form of a reduced claim.

23  That's the question, I guess.

24    THE COURT:  Well, but it, I guess -- okay.  Now I

25  understand your point now.  It's a jurisdictional point you're

D R A F T                                                                42

1    raising as opposed to a lifting of an injunction point.

2            MR. WILOMOWSKY:  I think so, Your Honor.

3            THE COURT:  But as far as jurisdiction goes in

4    addition to the narrow benefit issue isn't there jurisdiction

5    premised on the fact that the policy itself is property of the

6    estate and I'm being asked to interpret it and, secondly, the

7    fact that it's one in a layer of excess coverage and at some

8    point if the policy is interpreted properly and the facts play

9    out properly in that layer -- in that sequence of layers the

10   estate will benefit because there will be insurance that will

11   pay claims either of Ds and Os or of other claimants -- third

12   parties -- who were under the plan made the appropriate

13   election to look to the litigation and obviously the insurance

14   that is behind the litigation.

15           MR. WILOMOWSKY:  I think that's right, Your Honor.  I

16   think though that ironically though the granting of this motion

17   is more likely -- if you assume -- if we don't present --

18           THE COURT:  No, but you see that goes to the merits

19   as opposed to jurisdiction.  I understand but sometimes you

20   have --

21           MR. WILOMOWSKY:  I understand, Your Honor.  That was

22   it.  I think I've said enough.

23           THE COURT:  Okay.

24           MR. JEROME:  Your Honor, may I be heard?

25           THE COURT:  Yes.

D R A F T                                        43

1      MR. JEROME:   Your Honor, I represent Joseph P. Murphy

2  along with Baker, Hostetler.  Mr. Murphy was an officer of

3  Refco in charge of marketing and ran the regulated company

4  which as Your Honor may recall was sold in these bankruptcy

5  proceedings.  Now, Mr. Murphy, as an officer of Refco is

6  unfortunately embroiled in the various class actions.  He was

7  also a beneficiary of the various insurance policies which are

8  contested.

9      I think the dark and somewhat unstated fact here is

10  that as the assets -- and I'm not saying that it shouldn't be

11  done and that's not appropriate -- but equitably and fairly,

12  the unhappy fact is that as assets are burned for criminal

13  defense I have no doubt that the consequence of that will be

14  that Mr. Murphy will not in fact have enough funds from

15  insurance proceeds to answer to any judgment that might be

16  levied against him and I also think he probably will not have

17  sufficient funds to defend himself in the class actions given

18  what I know and maybe my knowledge is deficient and Your Honor

19  knows, sometimes that happens with me, but it may be I'm right

20  and I think that I am.

21      So in terms of weighing the harm and the equities

22  here, while I'm not suggesting that the criminal defendants are

23  entitled to the relief that they seek here I would like to

24  suggest that there is an opportunity that we have, an

25  opportunity of constricted time which we have between now and

D R A F T                                        44

1  October 12th when Your Honor will be called upon to make a

2  decision in respect of the permanent injunction.  I would hope

3  that in that constrained time frame we would, perhaps, resort

4  to some form of mediation and I know, Your Honor, the other

5  insurance companies are not before you and I'm certainly not

6  asking that this Court, although it has the power, to compel

7  mediation.  I'm suggesting that the parties in the interests of

8  trying to iron out these various issues which will continue,

9  Your Honor, to come before this Court because each and every

10  insurance company is going to deny coverage and is going to be

11  before this Court or some other court arguing this for months

12  on end.  I think that if Your Honor would at least on the

13  record, while not compelling arbitration, suggest that it might

14  be a good idea for the parties to engage in between now and

15  October 12th and in addition to the parties, those other

16  insurers who are not before Your Honor may at least get a

17  friendly message which would encourage them to sit down and try

18  to at least get the process started.  I think that the result

19  of an appropriately negotiated, successful mediation could

20  result in evening out, I think, some of the tawdry races that

21  we're witnessing in terms of first come/first serve, have you

22  gotten your bills in or haven't you and in point of fact, Mr.

23  Murphy's $13,000.00 bill for July wasn't filed on time.  We

24  were seven days late.

25          I know we'd like to avoid this and I think mediation,

D R A F T                                    45

1  hopefully, if it could resolve these matters could resolve

2  this, I think, unseemly race to the insurance courthouse.  So,

3  Your Honor, I would respectfully request that this Court at

4  least on the record encourage the parties to come to some form

5  of mediation.  I might add that there has been some discussion

6  between the parties on the subject and I think that some of

7  them might be favorably disposed to doing so.  If some of the

8  parties fall out and don't want to do it, that doesn't mean

9  that other parties involved, particularly my client, my shared

10 client, couldn't benefit from the mediation and in no way,

11 shape or form, Your Honor, am I suggesting that the mediation

12 would prejudice these proceedings or interfere with what's

13 going to happen on October 12th.  I am suggesting that we have

14 a window of time and I would hope that the Court would

15 encourage us and urge us to resort to mediation.

16         With that, Your Honor, I thank you very much for your

17 indulgence.

18         THE COURT:  Okay.

19         MR. EISEN:  Your Honor, I have a couple of very brief

20 points and then Ms. Moses will conclude on behalf of the

21 insureds.

22         With respect to counsel for Mr. Murphy's statement,

23 we wholeheartedly agree.  I don't know that it is necessary or

24 appropriate to be part of an order.  I take it there's no

25 disagreement as with the Debtor's position, they haven't

D R A F T                                        46

1   objected to the relief we seek and we think that the idea of

2   all sitting down and talking, bringing the other insurers to

3   the table is a good idea.  So, certainly, the movants today do

4   not need to be ordered to do that.  I do think that the

5   counsel's statement does emphasize the value of issuing an

6   order as of today that will apply to the payments of these fees

7   so that this race is not to the disadvantage of some.

8   Obviously, we think the disadvantage is greater as to the

9   criminal defendants.

10          On the jurisdictional point that the Debtor raised,

11  the Court responded more eloquently and knowledgeably than I

12  can and I would only echo those points by saying, you know, it

13  really is one dispute that all of the movants are queuing up

14  for the Court.  The Court has already found that it has

15  jurisdiction and as the Debtor noted, Mr. Grant had filed the

16  claims, they were disputed.

17          Then, finally, I looked back at whether it was agreed

18  or not as to the means of the previous movants and in fact it

19  was hotly contested.  Axis made the point very forcefully that

20  the previous insureds had not made a showing either that they

21  can't pay or that they can repay and the previous insureds

22  replied with equal force that that is not the test and I think

23  the Court will find that the record is completely devoid of

24  that evidence because under Worldcom and under Your Honor's

25  holding that showing is not required in a mega case of this

D R A F T                                      47

1  kind and with that I will yield to my colleague.

2         MS. MOSES:  Very briefly, Your Honor, and we do

3  appreciate the time you've devoted to this matter this morning.

4         Mr. Jerome used the term "unseemly" with respect to

5  the various insureds' request for defense payments.  I think

6  the only thing that can be said about that is that my client,

7  Mr. Trosten, and the other indicted plaintiffs, Mr. Bennett and

8  Mr. Grant, did not indict themselves.  They did not choose to

9  be criminal defendants, they are not --

10        THE COURT:  Well, I think he was just talking about a

11 rush to get bills in.  I think that's all he meant by that.

12        MS. MOSES:  Right.

13        MR. JEROME:  That's correct, Your Honor.  Thank you.

14        MS. MOSES:  With respect to the mediation point no

15 lawyer wants to be in the position of resisting a suggestion of

16 mediation and I certainly am not going to put myself in that

17 position but I do think it is fair to point out that while the

18 parties can and I hope they will voluntarily discuss a

19 potential non-litigation solution to this issue between now and

20 October 12th, nothing that we do between now and October 12th

21 can stop the clock with respect to the underlying actions,

22 either civil or criminal, and particularly given Axis' history

23 of resisting to the very last moment and sometimes beyond and

24 its demonstrated reluctance to write a check until and unless

25 it is specifically ordered to do so by this Court, my own view,

```
                           D R A F T                        48
```

 1  Your Honor, is that settlement discussions with an eye towards

 2  possibly a global settlement involving the higher tier carriers

 3  as well will be far more effective and far more likely to

 4  succeed after October 12th if, indeed, that is the date for

 5  summary judgment.  Thank you.

 6            THE COURT:  Okay.  Do you have anything to say, Ms.

 7  Gilbride?

 8            MS. GILBRIDE:  Yes, just very, very briefly, Your

 9  Honor.

10            With respect to the arguments advanced by both

11  counsel that the Worldcom decision controls somehow whether or

12  not Your Honor has to consider balancing of harms, I would just

13  simply submit that the Worldcom court did not consider

14  balancing of harms in any way, shape or form.  It didn't say

15  that you don't consider it, it simply wasn't considered.  There

16  is Second Circuit authority precisely on point which says that

17  the balancing of harms must be considered when the Court orders

18  a preliminary injunction.

19            With respect to the Catch-22 that counsel and Your

20  Honor are concerned about, respectfully, there is a provision

21  in the Federal Rules that deal with that precise issue, it's

22  Rule 65(c) which states that when ordering a preliminary

23  injunction a Court can and should but has discretion, of

24  course, order that the party who is being awarded the

25  preliminary injunction either post a bond or securitize the

D R A F T                                    49

1   amounts being awarded and, respectfully, I think that that

2   deals with the Catch-22 situation that counsel is referring to

3   and, perhaps, was meant for just that situation.

4           With respect to the priority of payments issue, Your

5   Honor, I haven't had a chance to confer with Baker & Hostetler

6   but if Your Honor so desires a copy of the MOU in camera with

7   consent of counsel, we'd be happy to submit that to you if you

8   so desire.

9           I have nothing further.  Thank you.

10          THE COURT:  Okay.

11          MR. EISEN:  Your Honor, could I just respond to the

12  Worldcom point because it is in the case?

13          THE COURT:  No, I read -- I know.

14          I'm going to take a look at Judge Woods' decision so

15  you can hand that up to me and I'm going to take a break but

16  before I do that I'm going to deal with the two pre-trials that

17  I put at the end of the calendar and then I'll come back to you

18  all probably by -- hopefully, by 12:00 or 12:15 so you can

19  check your Blackberrys and make some phone calls and I'll be

20  back around 12:15 or so is my guess with a ruling.

21          ALL ATTORNEYS:  Thank you, Your Honor.

22          THE COURT:  So if you could hand that up and then

23  I'll take the American Express v. Rodriguez or Gloria Ramirez.

24                  [Off the record.]

25          THE CLERK:  Please be seated.

D R A F T                                    50

1    THE COURT: Before the Court is a motion for a

2    preliminary injunction brought by Messrs. Grant, Trosten and

3    Bennett in this adversary proceeding in which they are

4    ultimately seeking a declaratory judgment and permanent

5    injunction against Axis Reinsurance Company, an excess insurer

6    that is currently in line in the tier of insurance coverage

7    obtained by the debtor, Refco, Inc., for its officers and

8    directors and itself.

9         Procedurally, I should go through the history of this

10   matter briefly.  The first step in respect of this insurance

11   company or insurance coverage dispute was taken by Axis in

12   initiating an adversary proceeding against not only Grant,

13   Trosten and Bennett but the other officers and directors of

14   Refco, Inc. who have made claims in respect of the policy as

15   well as Refco for a declaratory judgment that Axis was not

16   obligated to pay under the policy.

17        That was followed by different responses by various

18   groups of defendants.  First, one group of defendants

19   represented by Weil, Gotshal moved to dismiss Axis' adversary

20   complaint. Second, another group of officers and directors made

21   a counterclaim for the advancement of defense costs, and third,

22   the present group, Grant, Trosten and Bennett joined in or

23   purported to join in both of those requests for relief.  I

24   granted the motion to dismiss Axis' request for a declaratory

25   judgment as to its obligation generally under the policy to

D R A F T                                        51

1  provide coverage on the basis of the so-called substantial

2  overlap doctrine as set forth in numerous cases, including --

3  by Judge Cote in <u>In re: Worldcom, Inc. Securities Litigation</u>,

4  2002 W.L. 31729501 (S.D.N.Y., December 5, 2002) as well as in

5  <u>Adelphia</u> and <u>Enron</u>.

6           The basis set forth in my bench ruling was that

7  ultimately the facts that Axis would need to establish to

8  prevail on its claim and to the contrary the facts that the

9  defendants would need to refute to defeat Axis' claim

10  substantially overlap with facts that would also in all

11  likelihood arise in the pending securities litigation before

12  District Judge Lynch as well as potentially in the District

13  Court criminal litigation against Grant, Trosten and Bennett.

14           Turning then to the counterclaim and related request

15  for a preliminary injunction, I determined that there was a

16  likelihood of success on the merits and irreparable harm and

17  absent such sufficient questions going to the merits and the

18  balance of harms in favor of the counter-claimants to support

19  an injunction requiring the advancement of their defense costs

20  billed through the date of my order.

21           However, I also concluded that procedurally the

22  request for the same relief by Messrs. Grant, Trosten and

23  Bennett was not properly before me as they themselves had not

24  made a counterclaim and there was no adversary proceeding

25  asserting their claims against Axis and consequently no basis

D R A F T                                    52

1   for granting them a preliminary injunction.  They subsequently

2   remedied that procedural defect by commencing an adversary

3   proceeding and seeking and obtaining expedited hearing on their

4   motion for a preliminary injunction for the advancement of

5   defense costs.

6           I should note as an aside that the parties should,

7   unless I'm missing something, promptly consolidate this

8   adversary proceeding with the counterclaim which is now its own

9   adversary proceeding brought by the defendant's representative

10  in part by Baker & Hostetler.

11          I won't go over at length the findings that I made

12  and the rulings that I made at the prior hearing.  They're set

13  forth in the transcript which I've reviewed as far as typos and

14  misheard words are concerned corrected and I hope that's what

15  the parties have.  I think it is.

16          I'll note that there was a procedural matter that --

17  consistent with some of my remarks on the record Axis has

18  subsequently moved in the District Court for withdrawal of the

19  reference of the adversary proceeding and that well may be

20  heard before the hearing that I've scheduled for mid-October on

21  the ultimate relief requested by the counterclaim plaintiffs

22  and by Grant, Trosten and Bennett against Axis.

23          However, pending a determination of that motion for

24  withdrawal of the reference I continue to have jurisdiction and

25  as noted at the prior hearing and I think is reiterated today

D R A F T                                           53

1  in the colloquy with counsel for the Refco plan administrator,

2  I believe I have jurisdiction over this matter and this

3  adversary proceeding because it is one in which I am asked to

4  interpret the provisions of the Axis policy which is property

5  of the debtor's estate and secondly because the payments under

6  the policy affect distributions to creditors in this estate,

7  either creditors with indemnification claims such as the

8  directors and officers or perhaps ultimately securities law

9  creditors and others who have made claims not only against

10  Refco but also against officers and directors and under the

11  plan who agreed to a mechanism for pursuing those claims

12  jointly with the Refco estate.

13        This motion before me also seeks relief from -- what

14  it says is the automatic stay to permit payment of the

15  insurance proceeds in respect of the advancement of defense

16  cost which is also a core matter.  However, as I noted at the

17  last hearing, Paragraph 34 of the confirmation order provides

18  that the automatic stay itself is no longer in place.  However,

19  it also notes that it does not otherwise amend the plan and the

20  other provisions of the confirmation order which does contain

21  its own plan injunction which may be implicated by the payment

22  of the defense costs.

23        In any event, because of that request which I am

24  taking as a request for relief from the plan injunction as

25  opposed to from the automatic stay, I also as a third basis

D R A F T                                    54

1   have jurisdiction here because ultimately I'm being asked to

2   interpret the plan and enforce the plan by considering relief

3   from the injunction in the plan.

4           In short, the basis for the request for a preliminary

5   injunction is the movants' contention that under the applicable

6   insurance policies, which include the primary policies as

7   incorporated in the Axis policy, Axis is obligated to advance,

8   that is pay defense costs subject to reimbursement if it's

9   ultimately concluded that such defense costs were not covered

10  under the policy.

11          The movants contend that that contractual language

12  when coupled with the various presumptions regarding

13  interpretation of insurance policies under New York law

14  particularly provisions of insurance policies dealing with

15  exclusions and dealing with defense costs is clear and that

16  there's a substantial likelihood that they would prevail on the

17  merits.

18          They also contend that given the amount of defense

19  costs that have been incurred to date and the fact that they

20  are criminal defendants subject to freeze orders the failure to

21  advance the defense costs irreparably harms them in that it

22  impairs their ability to mount an effective defense in this

23  case of a criminal indictment.

24          They also contend that even if they were not a

25  substantial likelihood of success the balance of harms tips in

D R A F T                                          55

1   their favor given the foregoing contentions and the opposite

2   consideration that Axis is a very substantial corporation and

3   that it agreed to make these payments and take the risk of non

4   payment in the policy.

5          Finally, they state as a matter of public policy they

6   should not be saddled with the payment of the defense costs

7   since that would vitiate the purpose of a DNO policy and

8   ultimately discourage parties from serving as officers and

9   directors of a corporation.

10         They have not presented any other evidence than the

11  amount of the defense costs and the fact that they are facing a

12  criminal trial in March of 2008 and the request for me to take

13  judicial notice of freeze orders.  That is, they've not offered

14  evidence as to their financial condition or the law firm's

15  willingness to work with the overhanging uncertainty as to

16  whether they would ultimately be paid for conducting the

17  movants' defense.

18         Axis has responded by first disputing that there was

19  a substantial likelihood that the movants would ultimately

20  prevail on the merits.  It is also contended that as a factual

21  matter irreparable harm has not been shown and that neither has

22  a balance of the equities tipping in favor or balance of the

23  harms tipping in favor of the movants.  They also contend that

24  the public policy cited by some of the courts that have

25  previously considered this issue is less significant where an

D R A F T                                      56

1  officer and director is the subject of a criminal indictment

2  and is being defended in a criminal proceeding.  It has sought

3  a bond under Rule 65(c) as well.

4         Finally, it has contended that the relief that is

5  sought here is fundamentally inequitable because the movants

6  had previously joined in the motion which was successful to

7  dismiss Axis' declaratory judgment complaint.

8         As far as the amount of the defense cost is

9  concerned, I believe the record is now clear that through the

10  date of my prior injunction order, August 31st, the costs

11  billed was approximately $1.6 million for these three movants

12  and that is approximately $2.9 million as of today.  The policy

13  itself has a $10 million limit.

14         Clearly, as far as these defendants are concerned,

15  they have been in serious litigation mode with very large

16  defense costs being incurred since July of this year and it is

17  likely that that will continue over the next several months as

18  they prepare for trial in what appears to be a complex, at

19  least as a factual matter, case.  And I'll note in that regard

20  that I take judicial notice of the cost incurred by the Refco

21  estate of examining the facts and circumstances surrounding the

22  claims that at least overlap with the claims against Mr.

23  Bennett and the other two criminal defendants, costs which I

24  had to approve before they were paid.

25         Let me turn to the last point raised by Axis first.

D R A F T                                              57

1    I concluded last week that it is not inequitable to proceed

2    with this claim and to grant preliminary injunctive relief

3    notwithstanding the movants' prior request to dismiss Axis'

4    complaint although they along with Weil, Gotshal were

5    successful in that request or the Weil, Gotshal defendants were

6    successful in that request.  I do not believe there is a basis

7    for judicial estoppel here because I believe that the issues

8    pertaining to the motion to dismiss are fundamentally different

9    than the issues presented by the claim asserted in the present

10   adversary proceeding as well as the counterclaim asserted by

11   the other defendants.

12           As I noted previously, the basis for this request is

13   one in which I need not consider the factual issues that

14   overlap with the District Court securities litigation and the

15   criminal litigation but rather need only consider the language

16   of the contract, that is the insurance policies and the related

17   warranty and applicable case law.  If, in fact, I were to

18   conclude ultimately that Axis was not obligated to advance

19   defense costs but could withhold those costs pending a

20   determination as to whether they were -- whether Axis would be

21   successful in concluding that this denial of coverage was

22   appropriate and correct then there would be an overlap and at

23   that point this adversary proceeding and the adversary

24   proceeding brought by the counterclaim parties would be either

25   stayed or dismissed without prejudice pending the development

D R A F T                           58

1  of those facts in the multi district securities litigation

2  and/or the criminal case.  But I believe I can and unless the

3  reference is withdrawn I must consider whether as a matter of

4  reading the insurance policies and the case law and the related

5  warranty whether there is a separate obligation to advance

6  defense costs prior to determination of the underlying coverage

7  dispute based on whether there was a represent -- a breach of

8  the representation -- a breach of the so-called warranty and/or

9  the exclusions in the policy relied upon by Axis for disclaimer

10 of coverage.

11         Turning then to the other defenses raised by Axis,

12 let me address first the appropriate standard by which I should

13 consider the motion here for a preliminary injunction.  Axis

14 contends that because the relief sought here is one in which

15 Axis would be compelled to advance defense costs, this is a

16 request for mandatory injunctive relief rather than for a

17 prohibitory injunction.  Consequently, Axis argues I need to

18 consider the request pursuant to a heightened standard that

19 applies to mandatory injunctions where I would have to find on

20 the merits a substantial likelihood that the plaintiffs would

21 ultimately prevail.  See, for example, Tom Doherty Associates,

22 Inc. v. Sabian Entertainment, Inc., 60 F.3d 2735 (2d Cir.

23 1995).  In that case, the Second Circuit noted that the

24 distinction between a mandatory and a prohibitory injunction

25 has been the subject of criticism and particularly noted the

D R A F T                                        59

1   criticism of that standard in respect of breach of contract

2   cases where one party's assertion that the status quo is merely

3   being maintained is another party's assertion that that party

4   is actually breaching the status quo by breaching the

5   underlying agreement.

6          This very issue was addressed by what I believe to be

7   the leading case or the most relevant case to the issues before

8   me, that is Judge Cote's opinion in In re: Worldcom, Inc.

9   Securities Litigation, 354 F. Supp. 2d. 455 (S.D.N.Y. 2005) in

10  which she concluded ultimately that the heightened standard for

11  a preliminary mandatory injunction does not apply to a motion

12  for a preliminary injunction for the advancement of defense

13  costs for the reason that -- for the reasons that she lays out

14  at Page 463 of that opinion.  She notes first that in that

15  matter as well as here given that the amount at issue is well

16  under the policy limit that a preliminary injunction would not

17  make it difficult or impossible to render a meaningful remedy

18  to a defendant who prevails on the merits at trial in that only

19  part of the benefits to which the director, in this case the

20  directors and officers are seeking ultimately would be covered

21  here in the injunction.  And, secondly, that the policy itself

22  contemplated reimbursement.

23         That view was also recently followed in Great

24  American Insurance Company v. Gross, 2005 U.S. District Lexus

25  8003 (E.D. Virginia, May 3, 2005) which was vacated on other

D R A F T                                    60

1   grounds, 468 F. 3d 199 (4th Cir. 2006).

2          So I don't believe that I must follow the heightened

3   standard requiring the finding of clear likelihood or a

4   likelihood of success on the merits.  Nevertheless, I have

5   considered obviously whether there would be a likelihood of

6   success on the merits as did Judge Cote in the Worldcom case

7   but did not limit my inquiry to that analysis but considered

8   also the regular standard.

9          I conclude that, as did Judge Cote in her words,

10  nevertheless even if the heightened standard applies I believe

11  that the movants here have established a clear likelihood of

12  success on the merits.

13         Let me turn to the merits now.  As Judge Cote

14  recognized, under New York law, and as an aside I previously

15  concluded that New York law should apply to disputes in respect

16  of this insurance coverage for the reasons set forth in my

17  earlier bench ruling, while the plain language of an insurance

18  agreement as with any contract covered by New York law is the

19  best evidence and if unambiguous the only evidence of the

20  parties' intentions and as a matter of aw for the Court to

21  decide in respect of insurance contracts to the extent of an

22  ambiguity exists and is unresolved by extrinsic evidence such

23  ambiguity is read against the insurer.  The rule that insurance

24  policies are to be construed in favor of the insured is most

25  rigorously applied in construing the meaning of exclusions

D R A F T                                    61

1  incorporated into a policy of insurance or provision seeking to

2  narrow the insurer's liability. And, finally, that where a

3  contract of insurance includes the duty to defend or to pay for

4  the defense of its insured that duty is a heavy one.

5        As set forth by Judge Cote, in addition, under New

6  York law, including as interpreted by the Appellate Division in

7  the Koslowski Tyco case, as well as by numerous Southern

8  District courts, the duty of an insurer to pay an insured's

9  defense costs is distinct from and broader than its duty

10 ultimately to indemnify even where the policy does not provide

11 specifically for when defense costs are to be advanced.  It has

12 been held that they need to be advanced as incurred under a

13 liability policy as set forth in Judge Baer's Newway decision.

14       Moreover, it appears clear to me under New York law

15 that the duty to pay defense costs exists whenever a complaint

16 against the insured alleges claims that may be covered under

17 the insurer's policy.  That is, if it appears from the face of

18 the underlying complaint against the insured that there is an

19 issue as to whether that complaint sets forth a claim that may

20 be covered the costs would need to be advanced.  See, for

21 example, the Koslowski Tyco case as well as the Newway decision

22 which appears at 1997 U.S. District Lexus 11884 (S.D.N.Y.

23 August 12, 1997).

24       The opposition to the motion by Axis attempts to make

25 a distinction between situations where the courts have

D R A F T                                          62

1  considered refusal to pay defense costs because the insurer has

2  sought or has taken the position that the policy was rescinded.

3  It has also taken the position that there should be a

4  distinction between the present matter and decisions which have

5  dealt with the duty to defend as opposed to a duty to advance

6  defense costs.  But I conclude based on my review of the case

7  law that where an insurer takes the position that a claim is

8  not covered and therefore it is not obligated to advance

9  defense costs those distinctions are not meaningful in that

10 they apply in cases of rescission, cases where there's an

11 alleged obligation to advance and cases where there's an

12 alleged obligation to defend.

13         For example, in the Tyco Koslowski matter the insurer

14 alleged that the underlying claims were not covered and

15 therefore the defense costs would not be covered either.  The

16 Court held, however, that unless the insurer has no duty as a

17 matter of law it would have an obligation to advance the

18 defense costs stating that the duty to defend or pay defense

19 costs is construed liberally and any doubts about coverage are

20 resolved in the insured's favor.  Furthermore, an insurer can

21 only invoke a policy exclusion to avoid coverage if it can show

22 that the allegations in the complaint cast that pleading solely

23 and entirely within the policy exclusions.  The duty to defend

24 arises when the action is brought and is unaffected by the

25 outcome of the action.  See, also, Pepsico, Inc. v. Continental

D R A F T                    63

1  Casualty Company, S.D.N.Y. 1986, McGinnis v. Employer's

2  Reinsurance Corporation, 648 F. Supp. 1263 (S.D.N.Y. 1986), The

3  Great American Insurance Company v. Gross case that I referred

4  to earlier and G1 Holdings, Inc. v. Hayman -- I'm sorry, G1

5  Holdings, Inc. v. Reliance Insurance Company, 2006 U.S.

6  District Lexus 17597 (D. New Jersey, March 22, 2006).

7         Axis' response, in addition to saying that it need

8  not advance the costs pending resolution of the dispute, is

9  that it is clear from the language of the insurance policy

10 itself that there is no way that it would be obligated to

11 provide coverage here.

12         As I noted in my prior ruling on the earlier request

13 for an injunction, this is ultimately premised upon Axis'

14 reading of Paragraph D2 of the underlying policy which states

15 that the insurer will pay covered defense costs on an as

16 incurred basis.  If it is finally determined that any defense

17 costs paid by the insurer are not covered under this policy the

18 insured's agree to repay such non covered defense costs to the

19 insurer.  Axis contends that because of the word covered in the

20 first sentence it need not pay costs that are not covered under

21 the policy.

22         I conclude that it is likely that that interpretation

23 will not prevail given the foregoing case law as well as the

24 provision when read as a whole which first requires the insurer

25 to pay covered defense costs on an as incurred basis, i.e. not

D R A F T                                          64

1    waiting until an ultimate determination but as incurred with

2    out of pocket payment.  Secondly, the second sentence which

3    provides for reimbursement if it is finally determined that any

4    defense costs paid by the insurer were not covered.  Axis

5    contends that the word covered in the first sentence has to

6    mean covered by the policy but I have two responses to that.

7         The first is that I see little difference between

8    that argument and an argument that says that as in the cases

9    that I previously cited a defense cost falls into an exclusion

10   because it's not for costs determined to have arisen from

11   defense of a claim covered by a policy, i.e. the policy it was

12   argued in those other cases doesn't cover certain types of

13   claims and therefore the defense costs also would not fall into

14   the coverage of the policy.  Notwithstanding those arguments,

15   courts like the Koslowski court determined that the costs

16   should be advanced pending ultimate determination of that

17   issue.

18        Secondly, covered when one looks at the definition of

19   defense costs and loss in the first sentence, covered as used

20   in the first sentence after looking at those definitions could

21   mean whether it pertained to insured persons or not or whether

22   those persons had become legally obligated or not to make the

23   payments of their defense costs.

24        So, in any event, I believe that ultimately it is

25   likely that the movants here would prevail on the merits.  I

D R A F T                                                   65

1   conclude that the following paragraph of the policy which deals

2   with the allocation of losses covered and losses not covered by

3   the policy does little to advance Axis' interpretation and may

4   slightly advance the movants' in that it would seem to be

5   superfluous if Axis' interpretation were the correct one.  That

6   is, you would not need to provide for a distinction between

7   losses covered and losses not covered if the insurer could

8   withhold under Paragraph 2, defense costs that it believed were

9   not covered.

10          I do not believe the language which again requires

11  payment on an as incurred basis is materially different from

12  the language quoted by Judge Cote in the Worldcom case and

13  would need to be far clearer to create an exclusion here.

14          Turning to the issue of irreparable harm, Judge Cote

15  found in Worldcom that wherever individual officers and

16  directors were faced with substantial defense costs that were

17  not being paid they would -- they were subject to irreparable

18  harm.  As she says, it is impossible to quantify the impact on

19  a litigant of a failure to have adequate representation at this

20  critical stage of litigation.  The ability to mount a

21  successful defense requires competent and diligent

22  representation.  The impact of an adverse judgment will have

23  ramifications beyond the money that will necessarily be

24  involved.  That's especially true as noted by Judge Gerber in

25  the Adelphia Regis case where the insured or the beneficiary of

D R A F T                                    66

1  the policy is the subject of a criminal proceeding.

2         Judge Cote's not alone in finding irreparable harm in

3  these circumstances.  It was also found in the G1 and Gross

4  cases that I cited earlier as well as in McPeek v. Travelers

5  Casualty & Surety Company of America, 2006 U.S. District

6  Lexus -- I'm sorry, excuse me.  Let me back up.

7         It was recognized in the Bondex International, Inc.

8  v. Hartford Accident & Indemnity Company case, 2006 U.S.

9  District Lexus 50083 (N.D. Ohio, July 21, 2006) to apply in a

10 case of an individual beneficiary or insured under a director's

11 and officer's policy but would not apply to a corporation at

12 least absent evidence of insolvency which again I believe

13 heightens or puts a fine point upon the burden faced by an

14 individual here.

15        There is one case that takes a contrary view and that

16 is the McPeek case that I started to cite earlier.  McPeek v.

17 Travelers Casualty & Surety Company of America, 2006 U.S.

18 District Lexus 28619 (W.D. Pennsylvania, May 10, 2006) in which

19 the Court found there was not irreparable harm because there

20 had not been a showing, a factual showing that the

21 beneficiaries there would be unable to mount a defense.

22        There may conceivably be circumstances where an

23 additional factual showing would need to be made to establish

24 irreparable harm in this context but I believe that there's a

25 sufficient record before me to show irreparable harm given the

D R A F T                                67

1  substantial amount of the defense costs, the freezing of the

2  defendant's assets and the fact that they're subject to

3  criminal exposure.  So to the extent that I find McPeek at all

4  persuasive I believe it's distinguished under the present

5  circumstances as did Judge Cote.  Therefore, I've concluded,

6  although I do not believe the heightened standard needs to

7  apply, that the movants meet it here.

8         Turning, however, to the ordinary standard for a

9  preliminary injunction, I've already discussed the merits and

10 even if one were not to take the view that there was a clear or

11 substantial likelihood of success, for the reasons I've stated

12 I believe there is definitely sufficient issues going to the

13 merits that I would turn then to the balance of harms as the

14 merits are fair ground for litigation.

15        I conclude that the balance of harms tips decidedly

16 in favor of the movants here.  I believe that although she did

17 not have a heading in her opinion in which she balanced the

18 harms, Judge Cote did consider the harm not only to the movant

19 in not granting injunctive relief but also to the potential

20 harm to the insurer were she to grant the relief and concluded

21 as I conclude here that the balance of harms tip decidedly in

22 favor of the movant and that is she discussed the fact that the

23 -- in her belief there was no undue hardship on the insurer as

24 its liability is ultimately capped and secondly, that the

25 policy set out a mechanism that the insurer bargained for for

D R A F T                                    68

1  reimbursement ultimately and that particularly in light of the

2  potential harm to the movant and the public interest in favor

3  of advancing the defense costs, the insurer should not be

4  entitled to more.

5        In a more explicit analysis on both the <u>McPeek</u> and

6  <u>Great American v. Gross</u> case, similarly found a balance of

7  harms tipping in favor of the movant as well as the public

8  interest being in favor of the movant.

9        As noted at oral argument, Axis had cited to me an

10  unpublished, including not appearing on either Lexus or

11  Westlaw, ruling by Judge Wood in a civil matter, <u>Gayon v. Twin</u>

12  <u>City Fire Insurance Company</u>.  I've reviewed that

13  notwithstanding the Second Circuit's rule on citation to

14  unpublished opinions and the fact that a copy of the ruling was

15  not obtainable by the Court or provided to the Court prior to

16  oral argument and I conclude first that the decision by Judge

17  Wood is distinguishable in that she had to my mind a far

18  different view of the underlying merits of the case which is a

19  very different case than the case before me.  Note further that

20  while she mused that cases such as Worldcom may not have

21  considered sufficiently the balance of harms or the balance of

22  the equities, I do not view her as ultimately ruling on that

23  basis.

24        In any event, again, as I distinguished the McPeek

25  case, I believe that the amount at issue here and the fact that

D R A F T                                      69

1    this is a criminal matter distinguish the present matter from

2    Gayon.

3              As far as Axis' request that the movants post a bond

4    under Rule 65(c) incorporated by Rule 7065, I again follow the

5    logic set forth by Judge Cote in Worldcom which was also

6    adopted by the Great American v. Gross and G1 cases that I

7    cited earlier effectively to require a bond here in my view

8    would vitiate the entire ruling particularly since these are

9    individual defendants.  In essence, it would under the guise of

10   obtaining a bond require the movants to pay for insurance all

11   over again notwithstanding the language of the policy.

12             So I exercise my discretion not to require a bond in

13   these circumstances. I do so also mindful that the amount that

14   I'm going to require to be advanced is well within the capped

15   amount of the policy and that as I noted earlier the ultimate

16   issues here are teed up for a final determination in 31 days

17   and that leads into the last part of my ruling.

18             It was requested by Axis that I rule as to the proper

19   allocation or priority of payment of funds directed to be paid,

20   if any, by me. I do not believe that request is appropriately

21   before me given the seriousness of it the parties who would be

22   affected by it and the limited amount of notice.  As

23   importantly, I don't believe it's a ripe question because I

24   don't believe any other priority or any priority issues are

25   necessarily determined by my ruling today and further, although

D R A F T                                    70

1  this is not critical to my ruling, I don't believe that my

2  ruling today would put Axis in a position of acting at its

3  peril and paying out one way or another under the policy which

4  is generally disclaimed and refused to pay out under absent a

5  judicial ruling requiring it to do so.

6        It appears to me that therefore an order requiring

7  payment with a full reservation of rights as to the allocation

8  or priority of payment generally under the policy is

9  appropriate.  I've determined given the record as to the

10 billing of costs and the incurrence of costs that it would be

11 appropriate to require Axis to advance the defense costs to

12 these three movants billed through the date of my prior order

13 so that there's no, if you will, acceleration of billing, and

14 that in my view the costs through the date of the prior order

15 were in large measure billed in the ordinary course and I think

16 appropriately paid.

17        I also believe that requiring the payment through

18 that date puts these three movants on an even footing with the

19 other movants who previously obtained the preliminary

20 injunction.  Given that I will be ruling unless the reference

21 is withdrawn at or around October 12th, I believe that my

22 present ruling would provide sufficient comfort to the law

23 firms defending these three individuals that they will continue

24 to provide the same level of service going forward without the

25 necessity of paying them the additional amounts that have been

D R A F T                                    71

 1  billed starting in September and through today and that such

 2  payments would not be necessary to avoid irreparable harm in

 3  light of this ruling.

 4         So it's been represented by counsel for the movants

 5  that they would propose an order that's substantially similar

 6  if not essentially similar to the prior injunction that I had

 7  entered I believe it would contain the language about though

 8  the reservation and preservation of all issues as to priority

 9  of payment.  Have you -- do you have such an order?

10         MR. EISEN: Your Honor, I have the following order. I

11  also have a disk.  This order is identical other than changing

12  the identities of the parties.  I provided a copy to Ms.

13  Gilbride and I provided a copy to Ms. Kim before the hearing

14  today.  If the Court likes as last time I can hand this draft

15  up and the Court can --

16         THE COURT: Does it have the language about the

17  reservation of rights as to priority?

18         MR. EISEN: It does not have the language about

19  reservations of rights.

20         THE COURT: All right.  Well, you should consider the

21  injunction effective as of today but I think you should

22  circulate that language because I think it's meaningful to the

23  parties and you can submit an order tomorrow.  It's 1:20 now.

24  You may get it in today but submit it with that language.  You

25  don't have to settle it on the parties but they'll have some

D R A F T                                    72

1   time.  You should email it to them at the same time you submit

2   it to Chambers.  They can tell me if it doesn't agree with my

3   ruling.

4           MR. EISEN: I will, Your Honor.

5           MS. GILBRIDE: Your Honor, given the amount of money

6   involved and the fact that we've only recently received most of

7   these bills, Axis would respectfully request a reasonable

8   amount of time to review the bills and --

9           THE COURT: It's the same as the last ruling.  I think

10  it's -- it doesn't change anything as far as the policy, as far

11  as your other rights under the policy including reviewing the

12  bills, et cetera.

13          MS. GILBRIDE: It's just the turnaround time.  Since

14  we've just gotten the bills it does take a little bit of time

15  to review the bills.

16          THE COURT: Again, this doesn't change that.  I'm not

17  saying you pay them tomorrow.

18          MS. GILBRIDE: I think the order says that we pay them

19  within ten days of the order.

20          MR. EISEN: Your Honor, if I understand the Court

21  correctly, it's only the bills that were presented to Axis as

22  of the Court's previous --

23          THE COURT: The date was August 31st.

24          MR. EISEN: August 31st.

25          MS. GILBRIDE: Presented to us or through that day?

D R A F T                                73

1          THE COURT: Yes, billed.  Billed.

2          MR. EISEN: It's that the -- what I understood the

3    Court to be saying was the insurers had -- if the insurer had

4    the bills in hand as of August 31.

5          THE COURT: Okay.

6          MS. GILBRIDE: Thank you.

7          THE COURT: Now, as far as -- I know we're having -- I

8    had previously scheduled a telephonic conference on the 14th.

9    I saw the result in front of Jude Koetl. I don't know whether

10   there will be a motion for a stay or not.  I don't know where

11   you're going with withdrawal of the reference but I would like

12   to keep this on track for the 12th.  So --

13         MS. KIM:  Yes, Your Honor, that is our intention to

14   keep the motion for summary --

15         THE COURT: So I think we should still have that

16   conference on the 14th.

17         MS. KIM: That's fine, Your Honor. With respect to

18   Judge Koeltl, Judge -- we had an oral argument last Wednesday.

19         THE COURT: I read the -- someone attached the

20   transcript and the ruling.  So I'm up to date on that I think

21   unless there -- I read what was attached to the exhibit as an

22   exhibit.

23         MS. KIM: Well, actually that transcript, Axis

24   submitted a letter --

25         THE COURT: I saw that.  I saw that.  Very well.

D R A F T                          74

1  Raise the issue of mediation.  This is perhaps an appropriate

2  thing for the parties to do.  I did not hear Axis say whether

3  it would be amenable to mediation or not. I think it would need

4  to include the other insurers.  It seems to me that the parties

5  should consider mediation but I don't believe that these issues

6  should be put on hold unless there is substantial progress in

7  such a mediation.  It seems to me that, as I noted at the last

8  hearing --

9         MS. GILBRIDE: Just so Your Honor is clear, it was

10 actually Axis' suggestion initially.

11        THE COURT: That's fine.  I'm happy if Axis wants to

12 mediate but I think there are other insurers involved and that

13 would be fine to have happen but there's a -- I believe there's

14 a legal regime that governs in this area where insurers refuse

15 to pay under policies and the parties are free to mediate but

16 that legal regime governs and I think it needs to be followed

17 because there are consequences beyond just a ruling by the

18 Court as to whether the insured failed to pay or not.  So I'm

19 not going to hold off in the litigation unless there's

20 substantial progress on a mediation and I encourage the parties

21 to try to make substantial progress on it.  But I'm afraid the

22 parties means not just Axis but other parties.  This is not a

23 litigation matter.  This is a mediation matter and I think is a

24 practical matter to mediate it you're going to need other

25 parties, the other insurers.

                         D R A F T                              75

1          Ms. Kim.

2          MS. KIM: Your Honor, just one last housekeeping

3   matter.  Our intervention motion, I don't think anyone -- no

4   one opposed it.  So if you could just --

5          THE COURT: That's fine.  I obviously heard you all.

6   Again, the two proceedings should be consolidated I believe.

7   They raise the same issues in terms of interpreting the

8   contract at least.

9          MR. EISEN: Your Honor, we would move for

10  consolidation.  If the Court wants to order that now then we'll

11  take the appropriate steps with the clerk.

12         THE COURT: Do you want to think about that?

13         MS. GILBRIDE: Your Honor, we would appreciate an

14  opportunity to consider that.

15         THE COURT: That's fine.  That's fine.  It seems to me

16  it's sort of --

17         MR. EISEN: Thank you, Your Honor.

18                         * * * * *

19

20

21

22

23

24

25

D R A F T                                          76

1        I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                            _____

6                                    Shari Riemer

7   Dated:   September 12, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25